# CIVIL ACTION COVER SHEET

DOCKET NUMBER

## Massachusetts Trial Court
## Superior Court

COUNTY Worcester Superior Court (Worcester)

| Plaintiff | Grimes & Company, Inc. | Defendant: | Brian G. Carlson |
|---|---|---|---|
| ADDRESS: | 110 Turnpike Rd #100, Westborough, MA 01581 | ADDRESS: | 12 Ambergate Rise, Pittsford, NY 14534 |
| | | | |
| | | | |
| Plaintiff Attorney: | Brian M. Casaceli | Defendant Attorney: | Sharron E. Ash |
| ADDRESS: | Mirick O'Connell | ADDRESS: | Hamburger Law Firm LLC |
| 1800 West Park Drive, Suite 400, Westborough, MA 01581 | | 228 Park Ave S | PMB 51917 | New York, NY 10003-1502 | |
| | | | |
| BBO: | 690580 | BBO: | (Not Licensed in Massachusetts) |

## TYPE OF ACTION AND TRACK DESIGNATION (see instructions section on next page)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| D11 | Enforcement of Restrictive Covenant | F | ☒ YES   ☐ NO |

*If "Other" please describe: _____

| Is there a claim under G.L. c. 93A? | Is there a class action under Mass. R. Civ. P. 23? |
|---|---|
| ☐ YES  ☒ NO | ☐ YES  ☒ NO |

### STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. (Note to plaintiff: for this form, do not state double or treble damages; indicate single damages only.)

### TORT CLAIMS

A. Documented medical expenses to date

    1. Total hospital expenses                                    _____

    2. Total doctor expenses     _____

    3. Total chiropractic expenses     _____

    4. Total physical therapy expenses     _____

    5. Total other expenses (describe below)     _____

    _____

                                   Subtotal (1-5): _____ $0.00

B. Documented lost wages and compensation to date     _____

C. Documented property damages to date     _____

D. Reasonably anticipated future medical and hospital expenses     _____

E. Reasonably anticipated lost wages     _____

F. Other documented items of damages (describe below)     _____

_____

                                   TOTAL (A-F): _____ $0.00

G. Briefly describe plaintiff's injury, including the nature and extent of the injury:

### CONTRACT CLAIMS

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | Breach of Non-Solicitation and Confidentiality Clauses in Confidentiality and Restrictive Covenant Agreement | $55,000.00 |
| | Total | $55,000.00 |

| Signature of Attorney/Self-Represented Plaintiff: X  /s/ Brian M. Casaceli | Date: | May 22, 2024 |
|---|---|---|

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION UNDER S.J.C. RULE 1:18(5)

I hereby certify that I have complied with requirements of Rule 5 of Supreme Judicial Court Rule 1:18: Uniform Rules on Dispute Resolution, requiring that I inform my clients about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

| Signature of Attorney: X  /s/ Brian M. Casaceli | Date: | May 22, 2024 |
|---|---|---|

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT A CATEGORY THAT BEST DESCRIBES YOUR CASE*

### AC Actions Involving the State/Municipality†*

| | |
|---|---|
| AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. | (A) |
| AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AE1 Administrative Action involving Commonwealth, Municipality, MBTA,etc. | (A) |

### CN Contract/Business Cases

| | |
|---|---|
| A01 Services, Labor, and Materials | (F) |
| A02 Goods Sold and Delivered | (F) |
| A03 Commercial Paper | (F) |
| A04 Employment Contract | (F) |
| A05 Consumer Revolving Credit - M.R.C.P. 8.1 | (F) |
| A06 Insurance Contract | (F) |
| A08 Sale or Lease of Real Estate | (F) |
| A12 Construction Dispute | (A) |
| A14 Interpleader | (F) |
| BA1 Governance, Conduct, Internal Affairs of Entities | (A) |
| BA3 Liability of Shareholders, Directors, Officers, Partners, etc. | (A) |
| BB1 Shareholder Derivative | (A) |
| BB2 Securities Transactions | (A) |
| BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. | (A) |
| BD1 Intellectual Property | (A) |
| BD2 Proprietary Information or Trade Secrets | (A) |
| BG1 Financial Institutions/Funds | (A) |
| BH1 Violation of Antitrust or Trade Regulation Laws | (A) |
| A99 Other Contract/Business Action - Specify | (F) |

\* See Superior Court Standing Order 1-88 for an explanation of the tracking deadlines for each track designation: F, A, and X. On this page, the track designation for each case type is noted in parentheses.

†* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

‡ Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

### ER Equitable Remedies

| | |
|---|---|
| D01 Specific Performance of a Contract | (A) |
| D02 Reach and Apply | (F) |
| D03 Injunction | (F) |
| D04 Reform/ Cancel Instrument | (F) |
| D05 Equitable Replevin | (F) |
| D06 Contribution or Indemnification | (F) |
| D07 Imposition of a Trust | (A) |
| D08 Minority Shareholder's Suit | (A) |
| D09 Interference in Contractual Relationship | (F) |
| D10 Accounting | (A) |
| D11 Enforcement of Restrictive Covenant | (F) |
| D12 Dissolution of a Partnership | (F) |
| D13 Declaratory Judgment, G.L. c. 231A | (A) |
| D14 Dissolution of a Corporation | (F) |
| D99 Other Equity Action | (F) |

### PA Civil Actions Involving Incarcerated Party ‡

| | |
|---|---|
| PA1 Contract Action involving an Incarcerated Party | (A) |
| PB1 Tortious Action involving an Incarcerated Party | (A) |
| PC1 Real Property Action involving an Incarcerated Party | (F) |
| PD1 Equity Action involving an Incarcerated Party | (A) |
| PE1 Administrative Action involving an Incarcerated Party | (A) |

### TR Torts

| | |
|---|---|
| B03 Motor Vehicle Negligence - Personal Injury/Property Damage | (F) |
| B04 Other Negligence - Personal Injury/Property Damage | (F) |
| B05 Products Liability | (A) |
| B06 Malpractice - Medical | (A) |
| B07 Malpractice - Other | (A) |
| B08 Wrongful Death - Non-medical | (A) |
| B15 Defamation | (A) |
| B19 Asbestos | (A) |
| B20 Personal Injury - Slip & Fall | (F) |
| B21 Environmental | (F) |
| B22 Employment Discrimination | (F) |
| BE1 Fraud, Business Torts, etc. | (A) |
| B99 Other Tortious Action | (F) |

### RP Summary Process (Real Property)

| | |
|---|---|
| S01 Summary Process - Residential | (X) |
| S02 Summary Process - Commercial/ Non-residential | (F) |

### RP Real Property

| | |
|---|---|
| C01 Land Taking | (F) |
| C02 Zoning Appeal, G.L. c. 40A | (F) |
| C03 Dispute Concerning Title | (F) |
| C04 Foreclosure of a Mortgage | (X) |
| C05 Condominium Lien & Charges | (X) |
| C99 Other Real Property Action | (F) |

### MC Miscellaneous Civil Actions

| | |
|---|---|
| E18 Foreign Discovery Proceeding | (X) |
| E97 Prisoner Habeas Corpus | (X) |
| E22 Lottery Assignment, G.L. c. 10, § 28 | (X) |

### AB Abuse/Harassment Prevention

| | |
|---|---|
| E15 Abuse Prevention Petition, G.L. c. 209A | (X) |
| E21 Protection from Harassment, G.L. c. 258E(X) | |

### AA Administrative Civil Actions

| | |
|---|---|
| E02 Appeal from Administrative Agency, G.L. c. 30A | (X) |
| E03 Certiorari Action, G.L. c. 249, § 4 | (X) |
| E05 Confirmation of Arbitration Awards | (X) |
| E06 Mass Antitrust Act, G.L. c. 93, § 9 | (A) |
| E07 Mass Antitrust Act, G.L. c. 93, § 8 | (X) |
| E08 Appointment of a Receiver | (X) |
| E09 Construction Surety Bond, G.L. c. 149, §§ 29, 29A | (A) |
| E10 Summary Process Appeal | (X) |
| E11 Worker's Compensation | (X) |
| E16 Auto Surcharge Appeal | (X) |
| E17 Civil Rights Act, G.L. c.12, § 11H | (A) |
| E24 Appeal from District Court Commitment, G.L. c.123, § 9(b) | (X) |
| E94 Forfeiture, G.L. c. 265, § 56 | (X) |
| E95 Forfeiture, G.L. c. 94C, § 47 | (F) |
| E99 Other Administrative Action | (X) |
| Z01 Medical Malpractice - Tribunal only, G.L. c. 231, § 60B | (F) |
| Z02 Appeal Bond Denial | (X) |

### SO Sex Offender Review

| | |
|---|---|
| E12 SDP Commitment, G.L. c. 123A, § 12 | (X) |
| E14 SDP Petition, G.L. c. 123A, § 9(b) | (X) |

### RC Restricted Civil Actions

| | |
|---|---|
| E19 Sex Offender Registry, G.L. c. 6, § 178M | (X) |
| E27 Minor Seeking Consent, G.L. c.112, § 12S(X) | |

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES ☐ NO |

## STATEMENT OF DAMAGES REQUIRED BY G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF** — On the face of the Civil Action Cover Sheet (or on attached additional sheets, if necessary), the plaintiff shall state the facts on which the plaintiff relies to determine money damages. A copy of the completed Civil Action Cover Sheet, including the statement concerning damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT** — If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with the defendant's answer a statement specifying the potential damages which may result if the plaintiff prevails.

## A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
## IF THIS COVER SHEET IS NOT FILLED OUT THOROUGHLY AND
## ACCURATELY, THE CASE MAY BE DISMISSED.

J075

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS

WORCESTER SUPERIOR COURT
CIVIL ACTION NO. 2485CV589 B

GRIMES & COMPANY, INC.
    Plaintiff,

v.

BRIAN G. CARLSON.,
    Defendant.

**VERIFIED COMPLAINT AND
DEMAND FOR PRELIMINARY AND
PERMANENT EQUITABLE RELIEF**



## **INTRODUCTION**

This is an action brought by the Plaintiff, Grimes & Company, Inc. ("Grimes & Co." or the "Company"), against its former employee, Defendant Brian G. Carlson ("Defendant" or "Mr. Carlson"), for breach of contract. Mr. Carlson has breached restrictive covenants set forth in a Confidentiality and Restrictive Covenant Agreement (the "Agreement") he signed during his employment with Grimes & Co. As a direct of Defendant's wrongful conduct, Grimes & Co. has lost business and is at great risk of an erosion of its customer base. By this action, Grimes & Co. seeks preliminary and permanent equitable relief to prevent further irreparable harm. Grimes & Co. also seeks an award of monetary damages against Defendant for the harm it has already suffered.

## **THE PARTIES**

1.     The Plaintiff, Grimes & Co., is a Massachusetts domestic corporation with a principal place of business in Westborough, Worcester County, Massachusetts.

2.     The Defendant, Brian G. Carlson, an individual, is a New York resident, residing at 12 Ambergate Rise, Pittsford, NY 14534.

## JURISDICTION

3.      Mr. Carlson consented to the personal jurisdiction and venue of this Court pursuant to Section 13 of the Agreement.

4.      Section 13 of the Agreement states, in relevant part:

> To the extent not inconsistent with applicable law, I acknowledge and agree that this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, and the venue (i.e., location) for the resolution of any dispute or controversy shall be the County of Worcester, Commonwealth of Massachusetts.

A true and genuine copy of the Agreement is attached to this Verified Complaint as **Exhibit A**.

## FACTUAL ALLEGATIONS

### Grimes & Co.

5.      Grimes & Co. is a Registered Investment Advisor ("RIA") providing discretionary portfolio management and wealth management services for clients across the country.  Grimes & Co.'s mission is to provide its clients with disciplined asset management, strong performance, and unparalleled service and support.

6.      As an RIA, Grimes & Co. maintains a contractual relationship with promoting firms including Fidelity Investments ("Fidelity") and Charles Schwab ("Schwab").  As part of these contractual arrangements, Fidelity and Schwab may refer their investor clients who express a need and/or interest in securing professional portfolio management and wealth management services to Grimes & Co.  Absent the contractual relationships Grimes & Co. has with Fidelity & Schwab, Fidelity & Schwab would not refer their clients to Grimes & Co.

7.      When Grimes & Co. receives a client referral from Fidelity or Schwab, it then presents its services and a proposal to the client to retain Grimes & Co.'s discretionary portfolio management and wealth management services.

2

8.      Approximately half of the clients Grimes & Co. services are referred by Fidelity and Schwab.  Most of the remaining clients Grimes & Co. services are referred by existing Grimes & Co. clients.

9.      The identity of Grimes & Co.'s clients is not public knowledge.  Indeed, only a limited number of individuals know who among the general public are Grimes & Co. clients who have demonstrated a specific need and desire for the services Grimes & Co. provides.

### Grimes & Co.'s Client Goodwill and Confidential Information

10.     Grimes & Co. invests significant time, effort and resources in the development of its valuable relationships and the associated goodwill with its clients.  It is imperative that Grimes & Co. keep its client goodwill protected to retain the competitive advantage that it has developed in its highly competitive industry.

11.     Grimes & Co. has also invested significant time, effort and resources to develop confidential and proprietary information and processes to secure and maintain its competitive advantage in its industry.

12.     Grimes & Co. has amassed a great deal of confidential and proprietary business information and trade secrets regarding its investment advisory operations, methods and practices, including, but not limited to, books, records, lists, computer programs, and other information or documents regarding the Company's revenue, business methods, investment advisory process and practices (which includes financial planning and investment management), marketing strategies and plans, and referral sources, as well as information pertaining to the Company's past, present and prospective clients, including, but not limited to, identity, address, email address, telephone numbers, telefax numbers, account numbers, investment objectives, service requirements, and fees charged (collectively, the "Confidential Information").[1]

---

[1]   The definition of Confidential Information in this Paragraph shares the same meaning as in the Agreement.

13.     Grimes & Co.'s Confidential Information is highly valuable and provides Grimes & Co. a distinct competitive advantage provided it is used exclusively by Grimes & Co. and its employees.  Indeed, with respect to Confidential Information concerning a client, no competitor can effectively target a Grimes & Co. client and address their needs without access to or specific knowledge of client-related Confidential Information.

14.     The knowledge of the Confidential Information if available to or in the possession of Grimes & Co.'s competitors would be highly detrimental to Grimes & Co.'s ability to maintain its client relationships and revenue derived from those clients.  Indeed, with knowledge of the identity of a Grimes & Co. client, a competitor could intentionally target the client and solicit their business.

15.     Grimes & Co. undertakes a comprehensive, consistent and effective approach to protecting its Confidential Information.  This includes but is not limited to consistent messaging to employees regarding the importance of confidentiality in offer letters, employment agreements (such as the Agreement), and training.

16.     In addition, Grimes & Co. has adopted (i) a comprehensive privacy policy outlining how the Company protects the confidentiality of client information, and (ii) a written information security policy to ensure all client information in Grimes & Co.'s possession remains strictly confidential, and is accessed only by those employees at the Company who have a legitimate need-to-know.

17.     The Company also uses computer passwords and multi-factor authentication to protect against unauthorized access to Confidential Information.  Moreover, the Company sets access restrictions applicable to its own employees to ensure that employees are only permitted access to Confidential Information, including client-related information, which they need to perform their job functions.

4

**<u>Mr. Carlson's Employment with Grimes & Co.</u>**

18.      Mr. Carlson began his employment with Grimes & Co. on March 14, 2016.  Prior

to the start of his employment, and in consideration of his employment with the Company, Mr.

Carlson executed a Confidentiality and Restrictive Covenant Agreement (the "2016 Agreement")

containing, among other provisions, restrictive covenants governing his conduct both during and

after his employment with the Company.

19.      During his employment with Grimes & Co., Mr. Carlson held the position of

Financial Advisor.

20.      At the time of his hire and until in or about July 2020, Mr. Carlson lived in

Westborough, Massachusetts.  During that timeframe, Mr. Carlson spent the majority of his time

physically working out of the Company's office in Westborough, Massachusetts.  In or about

July 2020, Mr. Carlson moved to Pittsford, New York, where he worked remotely for Grimes &

Co.

21.      As part of his job duties and responsibilities as a Financial Advisor, Mr. Carlson

had access to and used Grimes & Co.'s Confidential Information in the performance of his job

duties.  In particular, as it relates to Grimes & Co.'s clients, Mr. Carlson was privy to their

identity, address, email address, telephone numbers, telefax numbers, account numbers,

investment objectives, service requirements, and the fees Grimes & Co. charged.

22.      In his position with Grimes & Co., Mr. Carlson was responsible for assisting

Grimes & Co.'s clients in identifying financial goals and working with Grimes & Co.'s portfolio

management team to design investment allocations and determine strategy selections to meet

clients' needs.

23.    Mr. Carlson would regularly speak with Grimes & Co.'s clients over the phone, via videoconference, through email, or in-person.

24.    As part of his job, Mr. Carlson would interview clients to determine current income, expenses, insurance coverage, tax status, financial objectives, risk tolerance, and other suitable information needed to develop a financial plan and investment policy statement.

25.    Mr. Carlson was also expected to consult with clients about their financial allocations and investment strategies as they evolve over time, and to contact clients periodically to determine any changes in their financial status.

26.    Mr. Carlson was responsible for interactions with clients to ensure satisfaction and maintain favorable relations.  Mr. Carlson was also responsible for managing ongoing client relationships.

27.    During his employment and with the support and investment provided by Grimes & Co., Mr. Carlson continued to develop Grimes & Co.'s goodwill with its clients.

28.    Approximately 90-95% of the clients with whom Mr. Carlson worked at Grimes & Co. were referred to Grimes & Co. by Fidelity and Schwab.  Most of the remaining clients with whom Mr. Carlson worked were referred to Grimes & Co. by other Grimes & Co. clients or assigned to Mr. Carlson by the Company.  Mr. Carlson did not develop these clients through his own contacts or leads.

29.    At least thirteen of the clients Mr. Carlson serviced while working for Grimes & Company were located in Massachusetts.

### Mr. Carlson Executes the Agreement

30.    As part of Grimes & Co.'s contractual arrangement with Schwab, Schwab required Grimes & Co. to ensure that all of its employees who work with clients referred by Schwab abide by certain policies, including confidentiality and non-solicitation restrictions.

6

31.     Consistent with Schwab's requirement, in May 2023, Grimes & Co. provided those of its employees who desired to continue to receive client referrals from Schwab with an updated confidentiality and restrictive covenant agreement attaching a copy of the Schwab Advisor Network Contact Policy.

32.     Grimes & Co. presented Mr. Carlson with the Agreement to review.

33.     On May 31, 2023, in consideration of his continued employment and the ability to continue to receive client referrals from Schwab, Mr. Carlson executed the Agreement. If Mr. Carlson had not executed the Agreement, he would not have been permitted to continue to receive client referrals from Schwab. The Agreement superseded the 2016 Agreement.

34.     The Agreement outlined Mr. Carlson's obligations both during and after his employment.

35.     Section 2 of the Agreement expressly provides:

> During the term of my employment/association, and forever thereafter (regardless of the circumstances surrounding termination), I agree not to use, communicate, reveal or otherwise make available such *Confidential Information* for any purpose whatsoever, nor will I divulge (or cause to be divulged) any such Confidential Information to any person, partnership, corporation or entity other than the Company except: (i) in furtherance of my employment duties to the Company; (ii) as required to testify truthfully before, or otherwise assist in any investigation or proceeding brought by the U.S. Securities and Exchange Commission, any state or federal regulatory body, or any law enforcement agency or other legislative body; or (iii) to the U.S. Securities and Exchange Commission about a possible securities violation in conformity with the "Whistleblower Regulations" under Section 21F of the Securities Exchange Act of 1934 including all related rules and provisions. Except with respect to the "Whistleblower Regulations," upon termination of my employment, or at any other time that the Company may so request, I shall immediately deliver to the Company all such *Confidential Information*, including, but not limited to, all papers, notes, lists, computer programs, reports, books, records and all other documents (and all copies thereof) relating to the Company as made reference to above, which I may then possess or have under my control. The above restrictions apply to all *Confidential Information* regardless of the format in which it is created or maintained (hard copy, electronic, or otherwise), or where it is maintained, including, but not limited to, all computer(s) that you may possess or have access to away from the Company's offices.

The foregoing language is referred to herein as the "Confidentiality Clause."

36.     Section 6 of the Agreement expressly provides:

In recognition of the highly confidential and proprietary nature of the Company's business methods and practices, I, during my employment/association with the Company, and for a period of twenty-four (24) months subsequent to termination of my employment/association for any reason (regardless of the circumstances surrounding termination), shall not, directly or indirectly, in any manner whatsoever:

(a)     neither solicit to render, nor render or accept, as a principal, agent, employee, consultant, stockholder, partner, member, officer, director or in any other capacity, for the benefit of any person or entity other than the Company, any investment advisory (i.e., investment management, financial planning, and related consulting services) or securities and insurance sales or brokerage (including the sale of any investment or insurance product) business from/to (i) any person or entity who is a client (exclusive of family members) of the Company at the inception of my employment/association, or becomes a client of the Company during the term of my employment association, unless otherwise specifically excluded and set forth on an annexed Schedule "A" (which may be amended from time-to-time in writing), which Schedule "A" must be executed and dated by both the Company and me to be effective…. In the event that the Company provides services to and/or through investment advisors, broker-dealers, or any other financial services provider (and/or directly or indirectly to any clients of such investment advisors, broker-dealers, etc.), the restrictions pertaining to the term "client" as used in this subparagraph 6a) shall also apply to all such entities….

The foregoing language is referred to herein as the "Non-Solicitation Clause."

37.     On March 1, 2024, Grimes & Co. terminated Mr. Carlson's employment. Upon his termination of employment, Grimes & Co. sent Mr. Carlson a copy of the Agreement and reminded him of his post-employment obligations to the Company, including the Confidentiality Clause and the Non-Solicitation Clause.

38.     Grimes & Co. performed all of its obligations owed to Mr. Carlson during his employment and as part of the Agreement.

### Mr. Carlson's Affiliation with Advisors Capital Management, LLC

39.     On or about April 9, 2024, Grimes & Co. learned that Mr. Carlson became affiliated with the wealth management team of Advisors Capital Management, LLC ("ACM"). Mr. Carlson's title with ACM is "Senior Wealth Advisor."

8

40.     ACM is a competitor to Grimes & Co.

41.     Mr. Carlson's biography on ACM's website states:

Brian G. Carlson, CFP® is a Senior Wealth Advisor with ACM Wealth. He works
with clients to create customized financial plans that align with their actively
managed portfolios to achieve their long-term goals. As a CERTIFIED
FINANCIAL PLANNER™ practitioner, Brian focuses on developing a
comprehensive holistic financial plan for each client and implementing tailored
investment strategies. Brian enjoys building meaningful relationships to better
serve as a fiduciary and address the specific needs of each client. Prior to joining
ACM in April 2024, *Brian guided over 150 families as a financial advisor from
2016-2024 at Grimes & Company, a nationally ranked RIA*. (Emphasis added).

A true and genuine copy of Mr. Carlson's biography on ACM's website is attached to this

Verified Complaint as **Exhibit B**.

42.     As described in the above biography, Mr. Carlson's job duties and responsibilities

as a Senior Wealth Advisor with ACM very closely align with his job duties and responsibilities

as a Financial Advisor for Grimes & Company.

43.     Grimes & Co.'s Confidential Information, including information concerning

Grimes & Co.'s clients, is being wrongfully used by Mr. Carlson in the performance of his

activities on behalf of ACM.

44.     Since his employment with Grimes ended, Mr. Carlson has, on behalf of ACM,

solicited business from Grimes & Co. clients with whom he directly worked while employed by

Grimes & Co.

45.     Mr. Carlson's solicitations have caused at least one Grimes & Co. client with

whom he directly worked while employed by Grimes & Co. to transfer their business to him at

ACM.

### Mr. Carlson's Solicitations and Use of Confidential Information

Client M.P.[2]

---

[2]  To protect the privacy of the individuals in question, initials are being used for identification purposes.

46.     M.P. became a Grimes & Co. client on or about May 5, 2020.  M.P. was referred
to Grimes & Co. by an existing Grimes & Co. client.  Mr. Carlson provided investment advisory
and wealth planning services to M.P. during his employment with Grimes.  Only by servicing
M.P. on behalf of Grimes & Co. did Mr. Carlson become aware of M.P. and the fact they were
interested in investment advisory services and wealth planning services.

47.     On Tuesday, April 9, 2024, after Mr. Carlson's employment with Grimes ended,
M.P. met with Grimes & Co. employee Cody Forbush ("Mr. Forbush") to review M.P.'s
accounts and discuss that he would be the Grimes & Co. representative servicing M.P.'s account
moving forward.

48.     On Thursday, April 11, 2024, Mr. Forbush sent M.P. an email following-up from
their meeting on April 9th.  A true and genuine copy of the email is attached to this Verified
Complaint as **Exhibit C**.

49.     M.P. did not respond to Mr. Forbush's April 9th email.  As a result, Mr. Forbush
sent another email to M.P. on April 23, 2024.  Exhibit C.

50.     M.P. responded to Mr. Forbush on April 24, 2024, writing:

> Cody,
>
> I reached out to Brian Carlson when I heard he was no longer with Grimes. We had
> developed a good working relationship over the last 4 years that I value. In addition,
> his new company looks to have more frequent and more understandable
> communication both written and recorded podcast.
>
> If they have not received it yet, Grimes will be receiving the required documentation
> for the change. I appreciated the more measured and balanced approach of Grimes
> investing. Not as much run up in good market times, but not as much downfall when
> the market is not doing so well.
>
> Thanks and best wishes.
>
> M.P.

Exhibit C.

51.     On April 25, 2024, M.P. sent an email to Mr. Forbush stating:

Brian,

Here is the correspondence we just discussed.  Note his initial email asking me to make a follow up appointment.

<u>Exhibit C.</u>

52.     Upon information and belief, M.P. intended to send the foregoing email to Mr. Carlson, but mistakenly sent the email to Mr. Forbush instead.  M.P. then sent another email to Mr. Forbush on April 25, 2024, stating: "My apologies for sending you this message."

<u>Exhibit C.</u>

53.     M.P. is no longer a client of Grimes & Co.

54.     Mr. Carlson solicited M.P. on behalf of ACM to provide investment advisory services in violation of the Agreement.  Due to Mr. Carlson's solicitation, M.P. transferred their business from Grimes & Co. to Mr. Carlson at ACM.

55.     Mr. Carlson violated the Agreement by using Confidential Information concerning M.P.'s identity to solicit them.

56.     As a result of Mr. Carlson's violations of the Agreement, Grimes & Co. has lost business.

<u>Client P.W.</u>

57.     P.W. became a Grimes & Co. client on or about March 28, 2019.  P.W. was referred to Grimes & Co. by TD Ameritrade.[3]  Mr. Carlson provided investment advisory and wealth planning services to P.W. during his employment with Grimes.  Only by servicing P.W. on behalf of Grimes & Co. did Mr. Carlson become aware of M.P. and the fact they were interested in investment advisory services and wealth planning services.

---

[3]  Schwab acquired T.D. Ameritrade in 2020.

58.     On May 7, 2024, Grimes & Co. received notification that P.W. was leaving Grimes & Co., and that they were going to work with Mr. Carlson at ACM.

59.     P.W. is no longer a client of Grimes & Co.

60.     Upon information and belief, Mr. Carlson solicited P.W. on behalf of ACM to provide investment advisory services to them in violation of the Agreement.  Upon information and belief, due to Mr. Carlson's solicitation, P.W. transferred their business from Grimes & Co. to Mr. Carlson at ACM.

61.     Upon information and belief, Mr. Carlson violated the Agreement by using Confidential Information concerning P.W.'s identity to solicit them.

62.     Upon information and belief, as a result of Mr. Carlson's violations of the Agreement, Grimes & Co. has lost business.

Client M.R.

63.     M.R. became a Grimes & Co. client on or about September 20, 2022.  M.R. was referred to Grimes by Fidelity.  Mr. Carlson provided investment advisory and wealth planning services to M.R. during his employment with Grimes & Co.  Only by servicing M.R. on behalf of Grimes & Co. did Mr. Carlson become aware of M.R. and the fact they were interested in investment advisory services and wealth planning services.

64.     On March 27, 2024, Grimes & Co. employee Timothy D. Rheaume ("Mr. Rheaume") met with M.R. via videoconference.  M.R. informed Mr. Rheaume that they were not concerned with the prior performance of their investments, and liked that their investment accounts had the flexibility to convert to cash.  Based on Mr. Rheaume's conversation with M.R., Mr. Rheaume believed that M.R. would be staying with Grimes & Co.

65.     However, on May 10, 2024, Grimes & Co. received notification that M.R. was leaving Grimes & Co. due to account performance.

66.     M.R. is no longer a Grimes & Co. client.

67.     Upon information and belief, Mr. Carlson solicited M.R. on behalf of ACM to provide investment advisory services to them in violation of the Agreement.  Upon information and belief, due to Mr. Carlson's solicitation, M.R. transferred their business from Grimes & Co. to Mr. Carlson at ACM.

68.     Upon information and belief, Mr. Carlson violated the Agreement by using Confidential Information concerning M.R.'s identity to solicit them.

69.     Upon information and belief, as a result of Mr. Carlson's violations of the Agreement, Grimes & Co. has lost business.

Client R.P.

70.     R.P. became a Grimes & Co. client on or about August 30, 2022.  R.P. was referred to Grimes & Co. by Fidelity.  Mr. Carlson provided investment advisory and wealth planning services to R.P. during his employment with Grimes.  Only by servicing R.P on behalf of Grimes & Co. did Mr. Carlson become aware of R.P. and the fact they were interested in investment advisory services and wealth planning services.

71.     On or about May 2, 2024, Mr. Carlson initiated contact with R.P.  Mr. Carlson informed R.P. that he obtained R.P.'s telephone number from R.P.'s son, who Mr. Carlson had looked up online and called the day before.

72.     Mr. Carlson told R.P. that he was calling to catch up on a personal basis, and if R.P. wanted information on Mr. Carlson's new firm, ACM, he would provide it.  R.P. agreed, and Mr. Carlson sent them an email shortly thereafter with information about ACM.

73.     Mr. Carlson violated the Agreement by soliciting R.P. to provide investment advisory services and wealth planning services.

13

74.     Mr. Carlson violated the Agreement by using Confidential Information concerning R.P.'s identity to solicit them.

75.     Upon information and belief, Mr. Carlson has solicited additional Grimes & Co. clients beyond M.P., P.W., M.R. & R.P since his employment with Grimes & Co. ended on March 1, 2024.

**Cease and Desist Demand**

76.     Once it learned of Mr. Carlson's efforts to solicit Grimes & Co.'s clients with whom he worked, Grimes & Co. – through its counsel – sent a demand letter to Mr. Carlson reminding him of his contractual obligations and demanding that he cease and desist from his wrongful activities.  A true and genuine copy of the cease-and-desist demand dated April 30, 2024, is attached to this Verified Complaint as **Exhibit D**.

77.     On the same day, Grimes & Co. – through its counsel – sent a demand letter to ACM advising ACM of Mr. Carlson's contractual obligations, and demanding that ACM ensure that Mr. Carlson's violative conduct cease immediately.  A true and genuine copy of the cease-and-desist demand dated April 30, 2024, is attached to this Verified Complaint as **Exhibit E**.

78.     Mr. Carlson has not discontinued his wrongful conduct.

79.     As a result of the wrongful conduct of Mr. Carlson, Grimes & Co. will suffer irreparable harm if that conduct is permitted to continue.

80.     Grimes & Co. has no adequate remedy at law.

**COUNT I**
**Breach Of Contract**
**(Non-Solicitation Clause)**

81.     Grimes & Co. re-alleges and incorporates by reference all preceding paragraphs as if fully alleged herein.

14

82.     By the conduct set forth herein occurring after the termination of his employment with Grimes & Co., Mr. Carlson breached the Non-Solicitation Clause in the Agreement.

83.     As a direct and proximate result of the aforementioned breaches, Grimes & Co. has suffered and will suffer harm irreparable harm and monetary damages.

**COUNT II**
**Breach of Contract**
**(Confidentiality Clause)**

84.     Grimes & Co. re-alleges and incorporates by reference all preceding paragraphs as if fully alleged herein.

85.     By the conduct set forth herein occurring after the termination of his employment with Grimes & Co., Mr. Carlson breached the Confidentiality Clause in the Agreement.

86.     As a direct and proximate result of the aforementioned breaches, Grimes & Co. has suffered and will suffer harm irreparable harm and monetary damages.

**REQUESTED RELIEF**

The Plaintiff respectfully requests that this Court enter the following relief:

PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

A.     That a Preliminary Injunction be entered during the pendency of this matter or until modified by this Court, and that a Permanent Injunction be entered thereafter restraining and enjoining Mr. Carlson as follows:

1.     *Disclosure of Solicitations of Clients.* Mr. Carlson is ordered to immediately disclose all solicitations, conversations, or efforts made by him on his own behalf or on behalf of ACM, or any other person, business, company, corporation, entity or firm which competes with Grimes & Co., to divert or take away investment advisory (i.e., investment management, financial planning, and related consulting services) and/or securities and insurance sales or brokerage (including the sale of any investment or insurance product) business from any of those

15

clients with whom he worked and/or about whom he acquired Confidential Information during his employment with Grimes & Co. (hereinafter "Clients") since March 1, 2024.

2. *Discontinue Solicitations of Clients.* With respect to any of the Clients, Mr. Carlson is hereby restrained from contacting or soliciting said Clients, or diverting or attempting to divert business of said Clients away from Grimes & Co. or otherwise interfering with Grimes & Co.'s relationship with any of said Clients. This Preliminary Injunction specifically restricts Mr. Carlson from any further efforts to solicit, divert, or take away investment advisory and/or securities and insurance sales or brokerage business from any Clients.

3. *Disclosure of Acceptance of Business from Clients.* Mr. Carlson is ordered to immediately disclose all investment advisory and/or securities and insurance sales or brokerage business he or ACM (as a result of Mr. Carlson's solicitations) has accepted from Clients since March 1, 2024.

4. *Non-Acceptance of Business from Clients.* Mr. Carlson, on his own behalf or on behalf of ACM or any other person, business, company, corporation, entity or firm is hereby restrained from accepting any investment advisory and/or securities and insurance sales or brokerage business from any Clients that result from Mr. Carlson's solicitation in violation of the Agreement.[4]

5. *Identification of Disclosed Confidential Information.* With respect to any Confidential Information including, but not limited to, information concerning Grimes & Co.'s clients, disclosed by Mr. Carlson to ACM or any other person, business, company, corporation, entity or firm, Mr. Carlson is ordered to immediately identify to Grimes & Co. all such

---

[4]    Grimes & Co. is <u>not</u> seeking to enjoin Mr. Carlson from accepting business from Grimes & Co. clients that he did not solicit to provide investment advisory and/or investment advisory and/or securities and insurance sales or brokerage business, but who nonetheless contact Mr. Carlson voluntary and without prompting by him or anyone on his behalf. Moreover, Grimes & Co. is not seeking to enjoin Mr. Carlson from providing services to those Clients who have already transferred their business to him and ACM. Grimes & Co. will pursue monetary damages for these transgressions.

information disclosed. With respect to this identification, Mr. Carlson must include (a) the nature of the information, (b) the date of disclosure, (c) the nature of the disclosure, (d) the purpose of the disclosure, (e) the use made of the information disclosed, and (f) the name and position of all employees of ACM or any other person, business, company, corporation, entity or firm which competes with Grimes & Co., to whom such disclosures have been made.

6.      *Delivery of Confidential Information.* Mr. Carlson is ordered to deliver all Confidential Information in his possession to Grimes & Co. In conjunction with the delivery of said Confidential Information, Mr. Carlson shall make copies to be retained by counsel to be used solely for the purposes of this litigation.

7.      *Deletion of Confidential Information.* With respect to any Confidential Information Mr. Carlson may have in his possession, he is ordered to permanently delete said Confidential Information and certify under oath to this Court that he has done so.

8.      *Restraint on Disclosure or Use of Confidential Information.* Mr. Carlson is hereby restrained from further use or disclosure of the Confidential Information of Grimes & Co.

<u>MONETARY AND OTHER RELIEF</u>

B.      That a judgment be entered in favor of Grimes & Co. and against Mr. Carlson for all monetary damages suffered by Grimes & Co., including its reasonable attorney's fees, in such amount as may be proved at trial.

C.      For such other and further relief as this Court may deem just and proper.

THE PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE.

4882-2570-2333, v. 1

**GRIMES & COMPANY, INC.**

By its attorney,

*/s/ Brian M. Casaceli*
Brian M. Casaceli, BBO #690580
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
Phone: 508.860.1478
Fax:    508.983.6295
Email: bcasaceli@mirickoconnell.com

Dated:  May 22, 2024

## **VERIFICATION**

I, Michael J. Davide, Chief Compliance Officer of Plaintiff Grimes & Company, Inc., do

hereby swear and affirm that the facts set forth in the foregoing Verified Complaint and Demand

For Preliminary and Permanent Equitable Relief, are true, except where asserted upon

information and belief, and in such instances, I have a good faith belief that they are true.

Signed under the pains and penalties of perjury this 22nd day of May, 2024.

*/s/ Michael J. Davide*
Michael J. Davide
Chief Compliance Officer
Grimes & Company, Inc.

18

# EXHIBIT A



## CONFIDENTIALITY *and* RESTRICTIVE COVENANT AGREEMENT

I, <u>Brian Carlson</u>, acknowledge and fully understand the need to keep completely confidential the business practices and operations of Grimes & Company, Inc., and each of its and their affiliated persons and entities, successors and assigns (together, the "Company"). In consideration of my initial and continued employment/association with the Company, **I hereby acknowledge and affirm my obligations to the Company, and I agree to be bound by the following terms of this Agreement**:

1.     I acknowledge that the purpose of this document is to protect the Company's legitimate interests in its client relationships, and the confidential information that the Company has developed about its clients, operations, markets, and services;

2.     During the course of my employment/association, I may have access to, and become familiar with, confidential information, proprietary information and/or trade secret information, and documentation related thereto, belonging to the Company or its clients regarding its investment advisory operations, methods and practices, including, but not limited to, books, records, lists, computer programs, and other information or documents regarding the Company's revenues, business methods, investment advisory processes and practices (which includes financial planning and investment management), marketing strategies and plans, and referral sources, as well as information pertaining to the Company's past, present and prospective clients, including, but not limited to, identity, address, e-mail address, telephone numbers, telefax numbers, account numbers, investment objectives, service requirements, and fees charged, and the Company's past, present and prospective referral sources, including, but not limited to, identity, address, e-mail address, telephone numbers, telefax numbers, and fee arrangement (all such confidential, proprietary and trade secret information and documentation is referred to herein as the *"Confidential Information"*). I acknowledge that such *Confidential Information* is owned, and shall continue to be owned, solely by the Company, regardless of whether or not I introduced a client to the Company or caused the receipt of such *Confidential Information* by the Company. During the term of my employment/association, and forever thereafter (regardless of the circumstances surrounding termination<u>), I agree not to use, communicate, reveal or otherwise make available such *Confidential Information* for any purpose whatsoever, nor will I divulge (or cause to be divulged) any such *Confidential Information* to any person, partnership, corporation or entity other than the Company except: (i) in furtherance of my employment duties to the Company; (ii) as required to testify truthfully before, or otherwise assist in any investigation or proceeding brought by the U.S. Securities and Exchange Commission, any state or federal regulatory body, or any law enforcement agency or other legislative body; or (iii) to the U.S. Securities and Exchange Commission about a possible securities law violation in conformity with the "Whistleblower Regulations" under Section 21F of the Securities Exchange Act of 1934 including all related rules and provisions.</u>   Except with respect to the "Whistleblower Regulations," upon termination of my employment/association, or at any other time that the Company may so request, I shall immediately deliver to the Company all such *Confidential Information*, including, but not limited to, all papers, notes, lists, computer programs, reports, books, records and all other documents (and all copies thereof) relating to the Company as made reference to above, which I may then possess or have under my control. The above restrictions apply to all *Confidential Information* regardless of the format in which it is created or maintained (hard copy, electronic, or otherwise), or where it is maintained, including, but not limited to, all computer(s) that you may possess or have access to away from the Company's offices.   *Confidential Information* shall not include information that I possessed prior to my association with the Company or information that is within the public domain.

In addition, to the extent that I provide services to and/or for any Company proprietary investment program, model, fund, process or otherwise, I acknowledge and agree that the Company owns all right, title and interest in and to any such program, model, fund, process or otherwise, and that Company shall continue to own

all such programs, models, funds and processes subsequent to termination of my association with the Company, for any reason. Upon such termination, I shall not, directly or indirectly, use or reference the Company or any such programs, models, funds, processes or otherwise without the express prior written consent of Company.

3.      Except as may be required in the ordinary course of discharging my duties to the Company, I agree not to remove from the Company's office (and represent to the Company that I have not previously removed, and do not currently have in my possession outside the premises of Company's office) any of the *Confidential Information* made reference to in paragraph 2 above, including, but not limited to, Company books, records, documents, lists, computer programs, or client documents and/or client information or lists, or any copies of such books, records, documents, lists, computer programs, or client documents and/or client information or lists, without the express prior written consent of Michael Davide, Chief Compliance Officer, or such other designated Company principal, and in the event such written consent is received, then such *Confidential Information* shall be immediately returned to the Company's office within the earlier of your completion of the project or task for which the *Confidential Information* was necessary or the demand for return of the *Confidential Information* by Michael Davide, Chief Compliance Officer, or such other designated Company principal;

4.      To the extent not contrary to applicable state law, I acknowledge and agree that any and all inventions, discoveries, improvements, trademarks, copyrightable work, or other intellectual property created, produced, designed and/or developed, in whole or in part, individually or jointly with others, during the term of my employment/association with the Company, which is/are directly or indirectly within the scope of the Company's past, current or planned future operations, are the Company's exclusive property, and shall be immediately disclosed and assigned to the Company. I further agree that any and all such applicable item(s) is a *work made for hire* for the Company within the definition of Section 101of Title 17 of the United States Code, or any successor provision, and any corresponding state law provisions. My above obligations to the Company shall be continuous and ongoing and shall survive the termination of this Agreement;

5.      I fully acknowledge and understand that my violation of any of the above covenants while I am employed by/associated with the Company, may, in addition to all other remedies available to the Company, result in the immediate termination of my employment/association;

6.      In recognition of the highly confidential and proprietary nature of the Company's business methods and practices, I, during my employment/association with the Company, and for a period of twenty-four months (24) months subsequent to termination of my employment/association for any reason (regardless of the circumstances surrounding termination), shall not, directly or indirectly, in any manner whatsoever:

     a) neither solicit to render, nor render or accept, as a principal, agent, employee, consultant, stockholder, partner, member, officer, director or in any other capacity, for the benefit of any person or entity other than the Company, any investment advisory (i.e. investment management, financial planning, and related consulting services) or securities and insurance sales or brokerage (including the sale of any investment or insurance product) business from/to: (i) any person or entity who is a client (exclusive of my family members) of the Company at the inception of my employment/association, or becomes a client of the Company during the term of my employment/association, unless otherwise specifically excluded and set forth on an annexed Schedule "A" (which may be amended from time-to-time in writing), which Schedule "A" must be executed and dated by both the Company and me to be effective; or (ii) any person or entity identified as a prospective Company client (i.e. any and all individuals or entities contacted by [or who contacts] the Company for the purpose of becoming a Company client within the 12 month period prior to the termination of my employment/association) by me, by any other employee/associate of the Company, or by the Company, during the term of my employment/association. In the event that the Company provides services to and/or through investment advisers, broker-dealers, or any other financial services providers (and/or directly or indirectly to any clients of such

Date Filed 5/22/2024 12:02 PM
Superior Court - Worcester
Docket Number
Document ID: 29647CD9-046F-42A4-8283-7DA55DD7E10A

investment advisers, broker-dealers, etc.), the restrictions pertaining to the term "client" as used in this subparagraph 6a) shall also apply to all such entities; or

b) solicit or contact any of the employees/associates, full-time or part-time, of the Company for the purpose of inducing them to leave the employ of/association with the Company; or

c) solicit or contact any referral sources of the Company for the purpose of inducing them to terminate or modify their relationship with the Company, or serve as a referral source for me. In addition, in the event that I solicit any client who was introduced to the Company by a referral source, and the Company becomes subject to a financial payment or penalty as result of my solicitation, I shall be responsible for any corresponding financial payments and/or penalties that are payable by the Company to the referral source resulting from my solicitation.

I also warrant and represent that I shall not engage in, encourage or promote any negative discussion or disclosure in any form or medium, that relates, denotes, connotes, or implies any dissatisfaction, critique or negative opinion pertaining to the Company or any of its officers, directors, owners, members, employees, representatives or agents.

I understand that the above restrictions are not intended to deprive me of an opportunity to earn a living in the same profession as that of the Company.  Rather, I agree to abide by the above restrictions in recognition of the Company's legitimate and reasonable objective to protect its business interests. I further understand my violation of any of the above covenants shall result in the unconditional forfeiture of any and all compensation (of whatever kind or nature) that may be due to me from the Company. Finally, I also understand and agree that upon termination of my employment/association with the Company (for any reason whatsoever), the Company shall have the right to notify my prospective employer of the existence of this Agreement, and I release and hold the Company harmless from any adverse consequences that may result therefrom.

7.     I further acknowledge and understand that my violation of any of the above covenants or restrictions will result in irreparable harm to the Company, and that an award of money damages, alone, will not be adequate to remedy such harm.  Consequently, in the event that I violate any of the above covenants or restrictions, the Company, in addition to any other rights and remedies provided under law, shall be entitled to both: (a) a preliminary or permanent injunction in order to prevent the continuation of such harm; and (b) money damages, insofar as they can be reasonably determined, including, without limitation, all reasonable costs and attorneys' fees incurred by the Company in enforcing the provisions of this Agreement;

8.     In the event that any provision of this Agreement shall be found by a court of competent jurisdiction to be invalid or unenforceable as written as a matter of law, such court(s) may exercise its discretion in reforming such provision(s) such that I shall be subject to nondisclosure, non-solicitation/noninterference and intellectual property assignment covenants that are determined by the court to be reasonable under the circumstances and enforceable by the Company;

9.     I acknowledge that I am prohibited from initiating and/or responding to any correspondence via any social media or my personal email account that pertains to any Company- related business or issues;

10.     In addition to the above obligations and covenants, I, by my execution of this Agreement in the space provided below, also acknowledge a copy of the Company's Privacy Policy, and shall correspondingly abide by the requirements thereof relative to *Confidential Information*;

11.  I acknowledge receipt of a copy of the attached **Schwab Advisor Network Contact Policy.**

12.     This Agreement supersedes and replaces, in its entirety, all previous agreement(s), written, verbal or otherwise, relative to the subject matter hereof. However, for any reason; should this Agreement (or any portion(s) hereof) be declared invalid or unenforceable, I shall then be subject to, and bound by, the covenants and restrictions contained in any previous agreement executed by me relative to the subject matter hereof; and,

13.     To the extent not inconsistent with applicable law, I acknowledge and agree that this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, and the venue (i.e., location) for the resolution of any dispute or controversy shall be the County of Worcester, Commonwealth of Massachusetts. I understand that the confidentiality and non-disclosure provisions above do not serve as a waiver of my rights under state and federal securities law and rules, to the extent applicable.

14.     The above notwithstanding, I understand that I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that:

- is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law; or,
- that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

**I also hereby acknowledge, understand and accept that:  (1) my employment/association is "at will" and that this Agreement does not cause an employment/association for any term; and (2) the Company may, at its discretion, and at any time, conduct (or hire an unaffiliated service to conduct) a background review, including a review of my civil and criminal history, credit history, CRD record, and I hereby consent to such reviews.**

**I acknowledge, understand and accept my obligations under this Agreement.  I also acknowledge, understand and accept that this Agreement does not cause an employment/association for any term.  I specifically acknowledge that the covenants set forth herein regarding _Confidential Information_ and restricting disclosure thereof, solicitation/interference, and acknowledging ownership of intellectual property are reasonable, appropriate and necessary for the protection of the Company's legitimate business interests. I further acknowledge and agree that I have been provided with good and valuable consideration in return for my execution of this Agreement.**

DocuSigned by:

_Brian Carlson_
646756DF1FE41B...
Signature

5/31/2023
Date

Case 1:24-cv-11521   Document 1-1   Filed 06/11/24   Page 26 of 94

DocuSign Envelope ID: 29647CD9-046F-42A4-8283-7DA55DD7E10A    Client-facing personnel    Network standing    Fees                    Appendices    Disclosures    20

# Network policies

This section explains the policies governing Network participation and the activities of advisors who work with investors we refer. Please make sure every member of your firm understands and conforms to these policies.

## Reporting

As a Network participant, you must notify Schwab of changes in status or control, disciplinary events, and legal proceedings. These requirements are specified in the Schwab Advisor Network Participation Addendum to Investment Manager Service Agreement. A summary of these requirements follows. See your Participation Addendum for more detail.

### Changes in status or control

The Participation Addendum generally requires you to immediately notify us in writing of any change in your status or ability to act as an investment advisor or financial planner under state or federal law. This includes any event that constitutes a change in control, such as entering into an agreement that may result in a sale of assets, merger, or consolidation.

"Control" means:

- The right to directly or indirectly vote 25% or more of a class of voting securities or interest in the advisor;
- The right to sell or direct the sale of 25% or more of a class of voting securities or capital of the advisor;
- A contribution of 25% or more of the capital of the advisor; or
- The right to receive 25% or more of the advisor's capital upon dissolution.

You must also provide us with 60 days advance written notice of any asset purchase, assignment, merger or other transaction that results in the movement of referred accounts to a third party. This notice should always be given to Schwab before any notice about the transaction is sent to clients.

### Third-party notice requirements

In addition to notices to Schwab, the Participation Addendum requires you to provide notice to third parties during due diligence period for any M&A deals or other potential agreements with your firm that could result in the sale, transfer, assignment or movement of client accounts to that third party. Specifically, you must disclose to the third party (1) Paragraph 13 of the Participation Addendum and (2) the entire Fee Schedule, effective July 1, 2021. We want any third party that may acquire referred accounts to be aware of the ongoing payment obligations well in advance of the close of any transaction.

### Disciplinary events

If an event causes you to answer "yes" to any question in Form ADV, Part 1A, Item 11, you must immediately notify us in writing and provide:

- The disclosure reporting pages of your Form ADV, Part 1A. If you are not required to file Form ADV, you must provide us with a substantially equivalent explanation for any part of a question in Form ADV, Part 1A, Item 11 that would require a "yes" answer.
- Copies of all amendments to your Form ADV no later than 10 business days after they are filed or deemed filed with the applicable regulatory authority.

You also must immediately notify us in writing if you or anyone in your firm is named as a defendant in any criminal, civil, administrative, remedial, or enforcement action brought by federal, state, or self-regulatory authorities.

## Use of the Schwab name

Use of Schwab's name is governed by the Use of Schwab Name Guidelines and subject to Schwab's approval. Pursuant to the Guidelines, you may not reference the Schwab Advisor Network in any communications, including marketing, presentations, websites, social media, press releases, or email signatures. This helps protect the value the Schwab brand delivers to our clients and yours.



**You're required to send a copy of your Form ADV, Part 2 A&B to us within 24 hours of filing with the SEC.**

**Email all updates to your Form ADV to:** schwabadvisornetwork@schwab.com

DocuSign Envelope ID: 29647CD9-046F-42A4-8283-7DA55DD7E10A

# Network policies (continued)

**Legal proceedings**

You must provide us with a written description of any pending or resolved arbitration or litigation filed at any time within the past seven years against you or your principals, officers, directors, employees, or any other person associated with you and any broker-dealer with which you are affiliated.

This disclosure must include the date on which the action was filed, its current status, and a description of the nature of the claim and the dollar amount involved.

You must also immediately notify us of any material change in the above information.

## Business entertainment, events, and gifts

The following activities targeting one or more branches can be funded by either the participating advisor(s) or Schwab:

- Advisor and one or more Financial Consultants meet for lunch or coffee for education or relationship-building purposes
- In-branch educational meetings scheduled through the Branch Manager; refreshments where appropriate
- Events focused on education and including one or more advisors and branches (e.g., off-site market-wide launches, multi-branch education events and best practices sessions)
- Relationship-building events with multiple advisors and one or more branches (e.g., golf scrambles); must be approved by Regional Branch Executive

Work with your branch partners to ensure that hospitality events include only Schwab-approved vendors. The branch team has access to an approved vendor list, based on the type of event you wish to host.

The following activities targeting one or more branches must be funded by Schwab:

- Smaller relationship-building outings with advisors and branch leadership

The following activities targeting Schwab Advisor Network clients or prospects may be funded by either the participating advisor(s) or Schwab:

- Various prospecting events involving one or more advisors, Financial Consultants, or branches (e.g., Market Wisdom events, seminar events, group hospitality events and relationship-building events)
- Client appreciation events for existing Schwab Advisor Network clients

Examples of prohibited activities include:

- Any advisor-funded one-on-one entertainment between an advisor and a Financial Consultant or Branch Manager (e.g., golf, baseball games, other sporting events)
- Any advisor-sponsored recognition dinners, happy hours, or activities for one or more branches



## Allowed and prohibited gifts

These guidelines will help you understand what Schwab considers an appropriate relationship engagement between advisors and Schwab employees. Our primary goal is to maintain the utmost program integrity while providing an environment where advisors and Financial Consultants can build effective working relationships. Please restrict your entertainment and events activity to assigned branches.

Examples of allowed gifts include:

- Small items or logo merchandise less than $25 in retail market value (e.g., notepads, caps, mugs)
- Holiday gift basket for an entire branch team

Examples of prohibited gifts include:

- Thank-you gifts of any kind from an advisor to a Financial Consultant or branch
- Books that have a retail value of more than $25

As part of a commitment to safeguarding data privacy, you must refrain from obtaining home addresses or other personal data about any branch employee, including Financial Consultants.

Questions?
Email schwabadvisornetwork@schwab.com.

Case 1:24-cv-11521 Document 1-1 Filed 06/11/24 Page 28 of 34

DocuSign Envelope ID: 29647CD9-046F-42A4-8283-7DA55DD7E10A    Client-facing personnel    Network standing    Fees    Appendices    Disclosures    22

## Network policies (continued)

### Presentations used during events

Branch events may take on a variety of forms and topics depending on your firm's capabilities and expertise and the individuals you're trying to attract. Looking across this landscape, we've identified some presentation best practices that resonate with our FCs and our clients.

#### Appearance and imagery

- In general, keep your presentation graphically simple and in your firm's brand design.
- Plan on about one slide for each two to three minutes of presentation time.
- Make sure all images are business appropriate.
- Use great care in interpreting data accurately into graphics. Include all relevant time frames, information and disclosures.
- Use credible data sources, using the most recent information available, and document them for the audience.
- At minimum, provide the source on the slide. If you don't include the date and publication title on the slide, include the full reference in your speaker notes.
- Design charts so they reflect your firm's brand and blend cohesively with rest of the presentation.

#### Disclosures

Required disclosures are determined by your firm's compliance and/or legal department; however, keep these items in mind:

- Please mention—preferably on your opening slide—that you're not affiliated with Schwab. You no longer need to include the Schwab Advisor Network disclosure language. The branch host will introduce you as a Network advisor and disclose the affiliation.
- Materials labeled "For institutional use only" aren't appropriate for a retail audience.

- Materials labeled "Not for client or public use" aren't appropriate for use with Schwab employees, prospects, or clients.

#### Language and tone

- Be concise.
- Don't overtly appeal to clients to hire your firm. Maintain respectful professional language throughout. Avoid jokes, profanity, derogatory comments, and other nonprofessional methods of capturing the audience's attention.
- Avoid biased or discriminatory language, including sexism and ageism.
- Avoid any reference to alcohol or drug use.
- Don't disparage Schwab or Schwab's competitors, directly or indirectly.
- Avoid false, exaggerated, or unwarranted claims or commentary.
- Avoid language that could be perceived as promissory. Add clarity and disclosures as appropriate for stronger statements.
- If you're stating an opinion, use hedging language and make sure to not represent your opinion as fact. Use terms such as "tends to be," "we believe," "in our view," etc., and make sure to include sources that help differentiate fact from opinion.
- Keep all materials fair and balanced, and provide balanced explanations of risks and potential benefits.
- Don't use Schwab (e.g., Schwab Center for Financial Research) or any major competitor of Schwab's (e.g., Fidelity, J.P. Morgan) as a source.

#### Closing the presentation

At the end of your presentation, don't solicit client or prospect information or propose individual meetings. If a client approaches or asks you, refer the person back to the FC or Branch Manager.



### Presentation business review

The business review is a required step. Submit your materials to your branch contact at least three weeks before the event date.

To make sure that the presentation topic is appropriate for the audience and that the visuals and messages are appropriate for our employees, prospects, and clients, the Branch Manager and the Network team will review all materials to be used by representatives of your firm or third parties you've engaged. The presentation should be educational in nature with no specific product references.

We will not perform a compliance review on your materials. It's your responsibility to make sure all materials have been reviewed by your firm's compliance officer or your legal counsel before submitting them to Schwab according to your firm's policies and procedures.

Questions?
Email schwabadvisornetwork@schwab.com.

Case 1:24-cv-11521  Document 1-1  Filed 06/11/24  Page 29 of 94

DocuSign Envelope ID: 29647CD9-046F-42A4-8283-7DA55DD7E10A    Client-facing personnel    Network standing    Fees        Appendices    Disclosures        23

# Network policies (continued)

## Contact policy

Investor clients of Schwab Investor Services may be referred to a Schwab Advisor Network Advisor based on the goals and objectives of the investor client. These referred investors remain clients of Schwab Investor Services.

This policy reflects Schwab's recognition of the right of our clients to choose, change, or work with multiple financial services providers and sets forth the practices Schwab will strive to apply in situations involving clients who have relationships with these Advisors.

**In the spirit of collaboration with participating Advisors, Schwab will:**

- Strive to maintain a relationship with and proactively communicate with the referred client to understand their ongoing needs and ensure overall satisfaction.
- Look for opportunities to consolidate additional client assets at Schwab. This will be accomplished through typical Schwab Investor Services business development activities.
- Provide the same level of account service to investors who choose to work with an Advisor as we provide to investors who work directly with Schwab Investor Services.
- Refer the client to their Advisor for investment strategy and selection questions on Advisor-managed accounts.

- Contact investors for business development purposes in cases where the relationship between an Advisor and their client has been terminated by either of them, after the decision to remove the limited power of attorney from the account has been confirmed or after the Advisor has been contacted.

**At Schwab, we will not:**

- Provide customized and specific investment recommendations to an investor on assets managed by an Advisor, with the following exception: Schwab Investor Services will take these assets into consideration to know and understand the client and for purposes of making suitable recommendations on assets held in Schwab Investor Services accounts.
  - To meet clients' needs, Schwab Investor Services will offer the full range of products and services to clients who maintain Schwab accounts outside of the Advisor relationship.
  - If a client expresses concerns about their existing Advisor relationship(s), Financial Consultants will attempt to refer the client back to their Advisor. However, if the client maintains their concerns, the Financial Consultant may recommend an alternative service or product, including a referral to another Network Advisor. This recommendation may only happen with their Branch Manager's approval. The Financial Consultant will receive no additional sales growth compensation for making a replacement Network referral.
- Share or make available confidential client or Advisor information to any other Advisor unless specifically authorized to do so by the client.

| We will | We will not |
|---|---|
| **Maintain** a relationship and proactively communicate with clients to ensure their satisfaction | **Provide specific** recommendations on Advisor-managed assets but will consider them to make recommendations on Schwab Investor Services accounts |
| **Look** for opportunities to consolidate additional assets through typical business development activities | **Proactively offer** Schwab advice solutions or recommend other advisors but will: |
| **Provide** the same level of account service as we do for clients who work directly with Investor Services | **Offer** all services to clients with accounts not managed by Advisor |
| | and/or |
| **Refer** clients to their Advisor for strategy and selection questions on Advisor-managed accounts | **Recommend** alternatives to clients who continue to express concern with their Advisor after referring them back to their Advisor |
| **Contact** investors for business development purposes after the Advisor relationship has been terminated or the Advisor has been contacted | **Share** confidential client or Advisor information with another Advisor unless authorized by a client |

DocuSign Envelope ID: 29647CD9-046F-42A4-8283-7DA55DD7E10A

## Network policies (continued)

### Non-solicitation and confidentiality

As a condition of receiving referrals through the Network, you must agree not to solicit or induce clients referred by Schwab to transfer their accounts away from Schwab or establish accounts at other custodians, except when fiduciary duty requires that you do so. This obligation lasts for the lifetime of the client relationship.

You must also have all firm employees who contact Schwab-referred clients sign a written agreement with your firm that is at least as restrictive as the Advisor Network Participation Addendum to the Service Agreement you sign with us regarding confidentiality and non-solicitation.

### Assignment Acceptance Policy

The Schwab Advisor Network Participation Addendum permits advisors to assign their rights and obligations upon written notice to Schwab, subject to Schwab's sole discretion over participation in the Schwab Advisor Network. If a Schwab Advisor Network advisor acquires, is acquired by, or merges with another registered investment advisor—regardless of whether the other advisor is itself a Schwab Advisor Network participant—Schwab will reevaluate ongoing active Schwab Advisor Network participation, for both firms if applicable, in light of relevant facts and circumstances and subject to its sole discretion.

Under this policy, an acquiring firm does not automatically gain access to new Schwab Advisor Network local markets by acquiring a Schwab Advisor Network participant firm that currently serves those local markets.

### Suspension or termination

Participation in the Network is discretionary. You or Schwab may terminate participation for any reason. Additionally, your firm may be suspended or terminated if you fail to maintain minimum practices and procedures, such as these (not an exhaustive list):

- **Not following up on referred investors.** Referrals may be suspended if you don't proactively follow up with clients, communicate regularly with Financial Consultants, or provide Schwab with regular updates via the Network area on schwabadvisorcenter.com.
- **Failure to meet billing deadlines.** Referrals may be suspended if you don't pay your fees on time.
- **Failure to provide updated information on your firm.** Referrals may be suspended if you fail to update your Advisor Profile with any and all material changes or you fail to provide Schwab with updates to your Form ADV or equivalent disclosure as specified in the Schwab Advisor Network Participation Addendum.
- **Failure to complete the Focused Compliance Review.** Your firm may be terminated if you fail to complete the review and implement recommended actions within the required time frame.
- **Failure to meet the Annual Participation Review questionnaire deadline.** Referrals may be suspended if you don't return the Annual Participation Review questionnaire within the required 30 days.
- **Failure to report regulatory action, investigations, or legal proceedings.** Your firm may be terminated if you fail to report resolved, pending, or threatened regulatory action, investigations, litigation, arbitration, or other legal proceedings.
- **Breach of agreement.** Your firm may be terminated if you fail to comply with any provision of the Schwab Advisor Network Participation Addendum.



### Hiring Schwab employees

Our Network Advisor/Investor Services Employee Hiring Policy is designed to strengthen collaboration between Schwab and our Network advisors by respecting existing employment relationships.

Under this policy, if an advisor hires a Schwab Investor Services client-facing employee within 12 months of their departure from Schwab, the Network firm will be removed from the Schwab Advisor Network program. There are no exceptions.

Client-facing employees include, but are not limited to:

- Financial Consultants
- Investment Consultants
- Client Service Specialists
- Branch Managers
- Wealth Advisors
- Associate Wealth Advisors
- Senior Regional Managers
- Financial Planners
- Independent Branch Leaders
- Independent Branch Client Service Specialists
- Wealth Management Consultant

Contact your Advisor Services Relationship Manager if you have any questions about this policy.

Questions?
Email schwabadvisornetwork@schwab.com.

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 29647CD9046F42A482837DA55DD7E10A | | Status: Completed |
| Subject: Complete with DocuSign: Confidentiality and Restrictive Covenant - Existing Employee_May2023.pdf | | |
| Source Envelope: | | |
| Document Pages: 9 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 0 | Julie Payton |
| AutoNav: Enabled | | jpayton@grimesco.com |
| EnvelopeId Stamping: Enabled | | IP Address: 75.69.232.186 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Julie Payton | Location: DocuSign |
|     5/25/2023 8:04:42 AM | jpayton@grimesco.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Brian Carlson | *DocuSigned by:* Brian Carlson —646756GF11FE41B... | Sent: 5/25/2023 11:14:44 AM |
| bcarlson@grimesco.com | | Viewed: 5/31/2023 7:02:22 AM |
| Security Level: Email, Account Authentication (None) | | Signed: 5/31/2023 7:04:04 AM |
| | Signature Adoption: Pre-selected Style | |
| | Using IP Address: 74.69.117.82 | |
| Electronic Record and Signature Disclosure: Accepted: 11/16/2020 2:22:16 PM ID: 4eeae312-20f4-4552-9cb9-5e8254d697e9 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/25/2023 11:14:44 AM |
| Certified Delivered | Security Checked | 5/31/2023 7:02:22 AM |
| Signing Complete | Security Checked | 5/31/2023 7:04:04 AM |
| Completed | Security Checked | 5/31/2023 7:04:04 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

| Electronic Record and Signature Disclosure | | |
|---|---|---|

Date Filed 5/22/2024 12:02 PM
Superior Court Electronic Record and Signature Disclosure created on: 11/6/2020 11:52:19 AM
Docket Number
Parties agreed to: Brian Carlson

## CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC DOCUMENTS AND SIGNATURES

Grimes & Company ("we" or "us") or ("Custodian") may be required to provide to you certain written notices or disclosures as part of the forms and agreements associated with doing business with us or Custodian. We are independent of and not owned, affiliated with or supervised by the Custodian. If the form or agreement presented is our document, such as a disclosure brochure or investment advisory agreement, then this Consent is between you and us. If the form or agreement presented is a Custodian document, such as an account application agreement, then this Consent is between you and the Custodian. We are your agent who chooses which electronic documents to send you for review and electronic signature. This is the case whether those documents are our forms or Custodian forms. You agree to immediately notify us if you receive any electronic document or information that appears to be in error or not intended for you. Described below are the terms and conditions for providing to you such notices and disclosures electronically for your signature through DocuSign, Inc.

Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document. If you want to use electronic documents and signatures, then you must consent and agree to the terms and conditions relating to the system and process that we and the Custodian will use, as set forth below. By checking the "I agree" button below, you will be giving your informed consent and agreement to use the electronic documents and signature system described below to electronically receive, review, and electronically sign paperless documents sent to you in electronic envelopes. You will be agreeing to be bound by any documents you electronically sign the same as if you had received a paper copy of the document and signed it by hand with an ink pen.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you from us or Custodian by contacting us. We may always, in our sole discretion, provide you with any document on paper, even if you have authorized electronic delivery.

### Withdrawing your consent

We and the Custodian will ask you for this Consent each time you are given an envelope of electronic documents. Once you give your Consent for an envelope, you cannot withdraw it for that envelope. You can, however, choose not to give your consent in the future when you are presented with subsequent envelopes. If you do this, you will be unable to proceed electronically, and you may be required to use paper documents and signatures. If you give your Consent for an envelope, although you may not withdraw it, you can still choose not to electronically sign any or all electronic documents in that envelope.

Once you electronically sign a particular document, you cannot withdraw the Consent and Agreement for that document, but you can choose to not electronically sign any other documents included in the same envelope. In addition, before you complete an electronic signature of a document, you may cancel and exit the electronic signing process before clicking the 'Confirm Signing' (or other similarly titled button) and closing your browser.

**How to Update Your Email Address**

Please contact us directly if you need to update your email address where we should send notices and disclosures electronically to you.

**Minimum required hardware and software**

Operating Systems:

Windows 7, Mac OS X, Mac iOS 11

Browsers for SENDERS:

Internet Explorer 11

Browsers for SIGNERS:

Internet Explorer 11, Google Chrome 65, Safari 11, Firefox Standard 59, Firefox Extended 52

Email:

Access to a valid email account

Screen Resolution:

800 x 600 minimum

1024 x 768 recommended

Enabled Security Settings:

Allow per session cookies

Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection

These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

Your use of the DocuSign system is subject to DocuSign's Terms of Use available at
www.docusign.com/company/terms-of-use. We, the Custodian, and DocuSign are not affiliated
with each other. Neither we nor the Custodian is responsible for the DocuSign system, and each
disclaims any representations and all warranties regarding the DocuSign system. Your use of the
DocuSign system is entirely your choice and solely your responsibility.

**Security and Privacy Information**

In accessing electronic documents and electronically signing them, you should use a computer
operating system that has a firewall (software that is designed to prevent unauthorized access to
your computer by blocking suspicious people or websites) and that it is turned on and up-to-date.
You should also make sure that your computer has anti-virus software that it is turned on and
that your subscription is current.

Emails sending you links to envelopes with electronic documents for electronic signature are not
encrypted (unless the email expressly says that it is encrypted); but the contents of the envelopes
are protected. For security and confidentiality, unencrypted emails will not include your name,
full account number, or any other personal identifier. Be aware, however, that some email
addresses may use part or all of your name. If you use a work email address, your employer or
other employees may have access to your email. As with any form of communication, there is a
risk of misdelivery or interception.

DocuSign has agreed with us to safeguard the security and privacy of all confidential customer
information. DocuSign's privacy policy applies to your use of the DocuSign system. In addition,
our privacy policy applies to information we receive from you as part of the electronic signature
process. Links or references to where you can view ours and Custodian's respective privacy
policies may be contained in the email notifying you of the documents on which your electronic
signature is requested or the documents themselves. You may also contact us to be directed to
our and/or Custodian's privacy policy.

**Acknowledging your access and consent to receive and sign documents electronically**

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF
  ELECTRONIC DOCUMENTS AND SIGNATURES document; and
- I can print on paper the disclosure or save or send the disclosure to a place where I can
  print it, for future reference and access; and
- I will not contest the validity or enforceability of any electronic document I receive or
  electronically sign because the document and my signature are in electronic form; and
- Until or unless I notify my Advisor as described above, I consent to sign exclusively
  through electronic means and to receive exclusively through electronic means all notices,
  disclosures, authorizations, acknowledgements, and other documents that are required to
  be provided or made available to me.

# EXHIBIT B

**ACM WEALTH**   Home   About   Services   Resources   Contact   🔍   Free Consultation

# Brian G. Carlson, CFP®

Home I Our Team I Brian G. Carlson, CFP®



## Brian G. Carlson, CFP®

Senior Wealth Advisor
**brian.carlson@acmwealth.com**

Brian G. Carlson, CFP® is a Senior Wealth Advisor with ACM Wealth. He works with clients to create customized financial plans that align with their actively managed portfolios to achieve their long-term goals. As a CERTIFIED FINANCIAL PLANNER™ practitioner, Brian focuses on developing a comprehensive holistic financial plan for each client and implementing tailored investment strategies. Brian enjoys building meaningful relationships to better serve as a fiduciary and address the specific needs of each client.

Prior to joining ACM in April 2024, Brian guided over 150 families as a financial advisor from 2016-2024 at Grimes & Company, a nationally ranked RIA. He also gained experience while working as a portfolio analyst for Natixis Asset Management, a globally recognized investment management firm with strategies across all major asset classes. Brian got his start in the industry working for an independent advisor in 2007, experiencing the 2008 crash taught him the importance of having a disciplined investment process.

Brian graduated from Gordon College with a B.A. in Finance and Business Administration. He passed the series 6 and 63 licensing exams and currently holds a series 65 registration.

Brian lives in Pittsford, New York with his wife and 3 young children. In his spare time, he enjoys woodworking, golfing, and sailing in the Finger Lakes.

## Contact Us Today!

Full Name
_____

Phone Number
_____

Email Address
_____

Subject
_____

I am interested in
☐ Retirement Planning          ☐ Income Investing
☐ Estate Planning              ☐ Investment Management
☐ Tax Planning
☐ Market and wealth planning updates and events

Write Message
_____

Schedule Consultation

Investment and Wealth Commentary
Delivered to Your Inbox Weekly

First Name

Last Name

Enter Email Address                                        Subscribe Now

**About**

About Us
Our Process
Our Team
Join our Team

**Resources**

Financial Insights
Articles
News and Events
Webinars
Podcasts
Videos

**Social**

Call: 201-447-3400

10 Wilsey Square, Suite 200
Ridgewood, NJ 07450

ACM Wealth is the wealth management team of Advisors Capital Management, LLC ("ACM"). ACM is an investment advisor registered with the United States Securities and Exchange Commission. Registration does not imply a certain level of skill or training. All written content on this site is for information purposes only. Opinions expressed herein are solely those of ACM, unless otherwise specifically cited. Material presented is believed to be from reliable sources and no representations are made by our firm as to another parties' informational accuracy or completeness. All information or ideas provided should be discussed in detail with an advisor, accountant or legal counsel prior to implementation. All investing involves risk, including the potential for loss of principal. There is no guarantee that any investment plan or strategy will be successful.

Copyright @ 2024 ACMWealth.com; All Rights reserved.    Privacy Policy    Disclaimer    FORM ADV Part 2A    FORM ADV – PART 3: CLIENT RELATIONSHIP SUMMARY

Website by Paradigm Marketing and Design

Date Filed 5/22/2024 12:02 PM
Superior Court - Worcester
Docket Number

# EXHIBIT C

## Casaceli, Brian M.

| | |
|---|---|
| **Subject:** | RE: Grimes Investment Reallocation |

**From:** M P███████████████ @gmail.com>
**Sent:** Thursday, April 25, 2024 1:46 PM
**To:** Cody Forbush <cforbush@grimesco.com>
**Subject:** Re: Grimes Investment Reallocation

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

My apologies for sending you this message.
M██

On Apr 25, 2024, at 11:38 AM, M██ P████ █████████ @gmail.com> wrote:

Brian,

Here is the correspondence we just discussed. Note his initial email asking me to make a follow up appointment.

M██

On Apr 24, 2024, at 1:32 PM, Cody Forbush <cforbush@grimesco.com> wrote:

Hi M██,

I'm sorry to see you go, but understand the value of a relationship.  If the opportunity presents itself, I'd be honored to work with you again and the door is open on our end.

To make it easy for the transition, we will prep things on our side and delink ourselves from the accounts.

Cody Forbush MBA, CFP®
Financial Advisor
402-819-2023 (Call or Text)
110 Turnpike Road, Suite 100
Westborough, MA  01581
www.grimesco.com

Easily schedule Zoom meeting or phone call: https://calendly.com/grimescody/60min
Safely upload statements to secure portal: http://www.grimesco.com/upload-documents
Directly contact service-manager Brenda Phillips: bphillips@grimesco.com / 508-366-3883 x 295

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, please notify us immediately by e-mail, and delete the original message without any review/dissemination thereof. Please Note: There can be no assurance, nor should there be any expectation, that Grimes & Company, Inc. ("Grimes") shall review or act upon any email on the day it is received-please be guided accordingly. Please remember to contact Grimes, **in writing,** if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluating/revising our previous recommendations and/or services, or if you want to impose, add, to modify any reasonable restrictions to our investment advisory services. Grimes shall continue to rely on the accuracy of information that you have provided. A copy of our current written disclosure Brochure and Form CRS discussing our advisory services and fees continues to remain available for your review upon request or at www.grimesco.com. Please Remember: Never send an email with personal identifiable information (i.e., Social Security Number, Tax ID Number, Driver's License Number, etc.) **unless** it is sent via a secure process to protect against unauthorized access.

**From:** M███ P████████████████@gmail.com>
**Sent:** Wednesday, April 24, 2024 2:13 PM
**To:** Cody Forbush <cforbush@grimesco.com>
**Subject:** Re: Grimes Investment Reallocation

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Cody,

I reached out to Brian Carlson when I heard he was no longer with Grimes. We had developed a good working relationship over the last 4 years that I value. In addition, his new company looks to have more frequent and more understandable communication both written and recorded podcast.

If they have not received it yet, Grimes will be receiving the required documentation for the change. I appreciated the more measured and balanced approach of Grimes investing. Not as much run up in good market times, but not as much downfall when the market is not doing so well.

Thanks and best wishes.

M███ P█████


> On Apr 23, 2024, at 1:38 PM, Cody Forbush <cforbush@grimesco.com> wrote:
>
> Hi M███,

2

Just following up with you to see if you could schedule an appointment with me to go over my recommended changes before I make any changes.

Here is a link directly to my calendar for your convenience: https://calendly.com/grimescody/60min

Cody Forbush MBA, CFP®
Financial Advisor
402-819-2023 (Call or Text)
110 Turnpike Road, Suite 100
Westborough, MA 01581
www.grimesco.com

Easily schedule Zoom meeting or phone call:
https://calendly.com/grimescody/60min
Safely upload statements to secure portal:
http://www.grimesco.com/upload-documents
Directly contact service-manager Brenda Phillips:
bphillips@grimesco.com / 508-366-3883 x 295


**<image001.png>**

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, please notify us immediately by e-mail, and delete the original message without any review/dissemination thereof. Please Note: There can be no assurance, nor should there be any expectation, that Grimes & Company, Inc. ("Grimes") shall review or act upon any email on the day it is received-please be guided accordingly. Please remember to contact Grimes, **in writing**, if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluating/revising our previous recommendations and/or services, or if you want to impose, add, to modify any reasonable restrictions to our investment advisory services. Grimes shall continue to rely on the accuracy of information that you have provided. A copy of our current written disclosure Brochure and Form CRS discussing our advisory services and fees continues to remain available for your review upon request or at www.grimesco.com. Please Remember: Never send an email with personal identifiable information (i.e., Social Security Number, Tax ID Number, Driver's License Number, etc.) **unless** it is sent via a secure process to protect against unauthorized access.

---

**From:** Cody Forbush
**Sent:** Thursday, April 11, 2024 10:32 AM
**To:** ████████@gmail.com
**Subject:** Grimes Investment Reallocation

M,

It was great to visit with you on Tuesday. I look forward to working with you!

I've had a chance to review your investments and recommend a few changes. I have attached what I believe is more in line with what you are trying to accomplish. Before I make any changes, shall we meet again to discuss? Here is a link to my calendar. Please find a time that works for you and we can chat then: https://calendly.com/grimescody/60min

Best,

Cody Forbush MBA, CFP®
Financial Advisor
402-819-2023 (Call or Text)
110 Turnpike Road, Suite 100
Westborough, MA 01581
www.grimesco.com

Easily schedule Zoom meeting or phone call:
https://calendly.com/grimescody/60min
Safely upload statements to secure portal:
http://www.grimesco.com/upload-documents
Directly contact service-manager Brenda Phillips:
bphillips@grimesco.com / 508-366-3883 x 295

<image001.png>

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, please notify us immediately by e-mail, and delete the original message without any review/dissemination thereof. Please Note: There can be no assurance, nor should there be any expectation, that Grimes & Company, Inc. ("Grimes") shall review or act upon any email on the day it is received-please be guided accordingly. Please remember to contact Grimes, **in writing**, if there are any changes in your personal/financial situation or investment objectives for the purpose of reviewing/evaluating/revising our previous recommendations and/or services, or if you want to impose, add, to modify any reasonable restrictions to our investment advisory services. Grimes shall continue to rely on the accuracy of information that you have provided. A copy of our current written disclosure Brochure and Form CRS discussing our advisory services and fees continues to remain available for your review upon request or at www.grimesco.com. Please Remember: Never send an email with personal identifiable information (i.e., Social Security Number, Tax ID Number, Driver's License Number, etc.) **unless** it is sent via a secure process to protect against unauthorized access.

# EXHIBIT D

# MIRICK O'CONNELL

### A T T O R N E Y S   A T   L A W

**Brian M. Casaceli**
Mirick O'Connell
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
bcasaceli@mirickoconnell.com
t 508.860.1478
f 508.983.6283

April 30, 2024

**VIA EMAIL AND CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Brian G. Carlson
12 Ambergate Rise
Pittsford, NY 14534

Re: **CEASE AND DESIST DEMAND by Grimes & Company, Inc.**

Dear Mr. Carlson:

Please be advised that this Firm represents Grimes & Company, Inc. ("Grimes" or the "Company") of Westborough, Massachusetts, your former employer. We are writing with respect to your current employment with the wealth management team of Advisors Capital Management, LLC ("ACM"). It is apparent that you have violated your continuing obligation to Grimes as set forth in detail below in connection with your new position with ACM.

**DEMAND IS HEREBY MADE THAT YOU IMMEDIATELY CEASE AND DESIST YOUR VIOLATIVE ACTIVITIES WITH ACM AND THAT YOU PROVIDE WRITTEN CONFIRMATION THAT YOU HAVE DONE SO.**

As you are undoubtedly aware, on May 31, 2023, you executed the Confidentiality and Restrictive Covenant Agreement ("the "Agreement), a copy of which is enclosed herewith. The purpose of the Agreement was to "protect the Company's legitimate interests in its client relationships, and the confidential information that the Company has developed about its clients, operations, markets, and services." To that end, the Agreement contains several provisions governing your conduct both during and following the termination of your employment.

As you know, during your employment with the Company, you had access to the Company's Confidential Information – as that term is defined in the Agreement – as well as its clients and information pertaining to their investment objectives, service requirements, and fees charged. In recognition of the foregoing, you expressly agreed that, for a period of twenty-four (24) months following your termination of employment with the Company for any reason, you would not, directly or indirectly, in any manner whatsoever:

---

MIRICK O'CONNELL

Brian G. Carlson
April 30, 2024
Page 2

[N]either solicit to render, nor *render or accept*, as a principal, agent, employee, consultant, stockholder, partner, member, officer, director or in any other capacity, for the benefit of any person or entity other than the Company, any investment advisory (i.e., investment management, financial planning, and related consulting services) or securities and insurance sales or brokerage (including the sale of any investment or insurance product) business from/to: (i) any person or entity who is a client (exclusive of [your] family members) of the Company at the inception of [your] employment/association, or becomes a client of the Company during the term of [your] employment/association....

Despite the clarity of the foregoing restriction, the Company recently learned that you have been in contact with a Company client and are facilitating a transfer of that client's assets from the Company to your new employer, ACM. Indeed, based on an email the client mistakenly sent Grimes, there is no doubt about your inappropriate involvement behind the scenes. Your conduct blatantly violates your agreement not to render or accept investment advisory business from a Company client for a period of twenty-four months. Your conduct is particularly egregious given that you specifically acknowledged that the "covenants set forth [in the Agreement] regarding Confidential Information and restricting disclosure thereof [and] solicitation/interference... are reasonable, appropriate and necessary for the protection of the Company's legitimate business interests."

Notably, in Section 7 of the Agreement, you acknowledged and expressed understanding that your violation of any of the covenants in the Agreement would "result in irreparable harm to the Company" and that the Company would be entitled to both "(a) a preliminary or permanent injunction in order to prevent the continuation of such harm; and (b) money damages, insofar as they can be reasonable determined, including, without limitation, all reasonable costs and attorneys' fees incurred by the Company in enforcing the provisions of this Agreement[.]"

**The Company demands that you immediately cease and desist from the unlawful conduct described herein and abide by the restrictions in the Agreement now and on a going forward basis.** We also demand that you disclose all solicitations made by you on behalf of ACM to Grimes' clients, as well as any services you have rendered to, or business you accepted from, any Grimes' clients since the end of your employment with the Company. We will then cross-check that list against Grimes' client list to determine whether it has been harmed by any violative conduct. Moreover, to the extent you are in possession of any Confidential Information, you must immediately identify and return such information to Grimes; you must retain no physical or electronic copies.

In addition, considering that your unlawful actions caused a direct financial loss for the Company, the Company demands that you remit payment to it in the amount of $27,000, which represents the estimated fees the Company would have received over the next two years servicing this client's account, as well as its reasonable attorneys' fees.

## MIRICK O'CONNELL

Brian G. Carlson
April 30, 2024
Page 3

     If we have not heard from you by the close of business on **Monday, May 6, 2024,** indicating your intent to cease and desist from the above activities, abide by the Agreement going forward, and pay the Company's damages, we will assume that you do not intend to comply with this demand.  In that event, the Company will take appropriate steps to enforce its rights judicially and seek all remedies to which it is entitled.

     We look forward to your prompt response.

Very truly yours,

Brian M. Casaceli

Enclosures


cc:    Grimes & Company
       Advisors Capital Management, LLC

DocuSign Envelope ID: 29647CD9-046F-42A4-8283-7DA55DD7E10A



## CONFIDENTIALITY *and* RESTRICTIVE COVENANT AGREEMENT

I, __Brian Carlson__, acknowledge and fully understand the need to keep completely confidential the business practices and operations of Grimes & Company, Inc., and each of its and their affiliated persons and entities, successors and assigns (together, the "Company). In consideration of my initial and continued employment/association with the Company, **I hereby acknowledge and affirm my obligations to the Company, and I agree to be bound by the following terms of this Agreement:**

1.      I acknowledge that the purpose of this document is to protect the Company's legitimate interests in its client relationships, and the confidential information that the Company has developed about its clients, operations, markets, and services;

2.      During the course of my employment/association, I may have access to, and become familiar with, confidential information, proprietary information and/or trade secret information, and documentation related thereto, belonging to the Company or its clients regarding its investment advisory operations, methods and practices, including, but not limited to, books, records, lists, computer programs, and other information or documents regarding the Company's revenues, business methods, investment advisory processes and practices (which includes financial planning and investment management), marketing strategies and plans, and referral sources, as well as information pertaining to the Company's past, present and prospective clients, including, but not limited to, identity, address, e-mail address, telephone numbers, telefax numbers, account numbers, investment objectives, service requirements, and fees charged, and the Company's past, present and prospective referral sources, including, but not limited to, identity, address, e-mail address, telephone numbers, telefax numbers, and fee arrangement (all such confidential, proprietary and trade secret information and documentation is referred to herein as the "*Confidential Information*"). I acknowledge that such *Confidential Information* is owned, and shall continue to be owned, solely by the Company, regardless of whether or not I introduced a client to the Company or caused the receipt of such *Confidential Information* by the Company. During the term of my employment/association, and forever thereafter (regardless of the circumstances surrounding termination), I agree not to use, communicate, reveal or otherwise make available such *Confidential Information* for any purpose whatsoever, nor will I divulge (or cause to be divulged) any such *Confidential Information* to any person, partnership, corporation or entity other than the Company except: (i) in furtherance of my employment duties to the Company; (ii) as required to testify truthfully before, or otherwise assist in any investigation or proceeding brought by the U.S. Securities and Exchange Commission, any state or federal regulatory body, or any law enforcement agency or other legislative body; or (iii) to the U.S. Securities and Exchange Commission about a possible securities law violation in conformity with the "Whistleblower Regulations" under Section 21F of the Securities Exchange Act of 1934 including all related rules and provisions.   Except with respect to the "Whistleblower Regulations," upon termination of my employment/association, or at any other time that the Company may so request, I shall immediately deliver to the Company all such *Confidential Information*, including, but not limited to, all papers, notes, lists, computer programs, reports, books, records and all other documents (and all copies thereof) relating to the Company as made reference to above, which I may then possess or have under my control. The above restrictions apply to all *Confidential Information* regardless of the format in which it is created or maintained (hard copy, electronic, or otherwise), or where it is maintained, including, but not limited to, all computer(s) that you may possess or have access to away from the Company's offices. *Confidential Information* shall not include information that I possessed prior to my association with the Company or information that is within the public domain.

In addition, to the extent that I provide services to and/or for any Company proprietary investment program, model, fund, process or otherwise, I acknowledge and agree that the Company owns all right, title and interest in and to any such program, model, fund, process or otherwise, and that Company shall continue to own

████████████████████████████████████████████████

DocuSign Envelope ID: 29647CD9-046F-42A4-8283-7DA55DD7E10A

all such programs, models, funds and processes subsequent to termination of my association with the Company, for any reason. Upon such termination, I shall not, directly or indirectly, use or reference the Company or any such programs, models, funds, processes or otherwise without the express prior written consent of Company.

3.     Except as may be required in the ordinary course of discharging my duties to the Company, I agree not to remove from the Company's office (and represent to the Company that I have not previously removed, and do not currently have in my possession outside the premises of Company's office) any of the *Confidential Information* made reference to in paragraph 2 above, including, but not limited to, Company books, records, documents, lists, computer programs, or client documents and/or client information or lists, or any copies of such books, records, documents, lists, computer programs, or client documents and/or client information or lists, without the express prior written consent of Michael Davide, Chief Compliance Officer, or such other designated Company principal, and in the event such written consent is received, then such *Confidential Information* shall be immediately returned to the Company's office within the earlier of your completion of the project or task for which the *Confidential Information* was necessary or the demand for return of the *Confidential Information* by Michael Davide, Chief Compliance Officer, or such other designated Company principal;

4.     To the extent not contrary to applicable state law, I acknowledge and agree that any and all inventions, discoveries, improvements, trademarks, copyrightable work, or other intellectual property created, produced, designed and/or developed, in whole or in part, individually or jointly with others, during the term of my employment/association with the Company, which is/are directly or indirectly within the scope of the Company's past, current or planned future operations, are the Company's exclusive property, and shall be immediately disclosed and assigned to the Company. I further agree that any and all such applicable item(s) is a *work made for hire* for the Company within the definition of Section 101of Title 17 of the United States Code, or any successor provision, and any corresponding state law provisions. My above obligations to the Company shall be continuous and ongoing and shall survive the termination of this Agreement;

5.     I fully acknowledge and understand that my violation of any of the above covenants while I am employed by/associated with the Company, may, in addition to all other remedies available to the Company, result in the immediate termination of my employment/association;

6.     In recognition of the highly confidential and proprietary nature of the Company's business methods and practices, I, during my employment/association with the Company, and for a period of twenty-four months (24) months subsequent to termination of my employment/association for any reason (regardless of the circumstances surrounding termination), shall not, directly or indirectly, in any manner whatsoever:

a)     neither solicit to render, nor render or accept, as a principal, agent, employee, consultant, stockholder, partner, member, officer, director or in any other capacity, for the benefit of any person or entity other than the Company, any investment advisory (i.e. investment management, financial planning, and related consulting services) or securities and insurance sales or brokerage (including the sale of any investment or insurance product) business from/to: (i) any person or entity who is a client (exclusive of my family members) of the Company at the inception of my employment/association, or becomes a client of the Company during the term of my employment/association, unless otherwise specifically excluded and set forth on an annexed Schedule "A" (which may be amended from time-to-time in writing), which Schedule "A" must be executed and dated by both the Company and me to be effective; or (ii) any person or entity identified as a prospective Company client (i.e. any and all individuals or entities contacted by [or who contacts] the Company for the purpose of becoming a Company client within the 12 month period prior to the termination of my employment/association) by me, by any other employee/associate of the Company, or by the Company, during the term of my employment/association. In the event that the Company provides services to and/or through investment advisers, broker-dealers, or any other financial services providers (and/or directly or indirectly to any clients of such

DocuSign Envelope ID: 29647CD9-046F-42A4-8283-7DA55DD7E10A

investment advisers, broker-dealers, etc.), the restrictions pertaining to the term "client" as used in this subparagraph 6a) shall also apply to all such entities; or

b) solicit or contact any of the employees/associates, full-time or part-time, of the Company for the purpose of inducing them to leave the employ of/association with the Company; or

c) solicit or contact any referral sources of the Company for the purpose of inducing them to terminate or modify their relationship with the Company, or serve as a referral source for me. In addition, in the event that I solicit any client who was introduced to the Company by a referral source, and the Company becomes subject to a financial payment or penalty as result of my solicitation, I shall be responsible for any corresponding financial payments and/or penalties that are payable by the Company to the referral source resulting from my solicitation.

I also warrant and represent that I shall not engage in, encourage or promote any negative discussion or disclosure in any form or medium, that relates, denotes, connotes, or implies any dissatisfaction, critique or negative opinion pertaining to the Company or any of its officers, directors, owners, members, employees, representatives or agents.

I understand that the above restrictions are not intended to deprive me of an opportunity to earn a living in the same profession as that of the Company.  Rather, I agree to abide by the above restrictions in recognition of the Company's legitimate and reasonable objective to protect its business interests. I further understand my violation of any of the above covenants shall result in the unconditional forfeiture of any and all compensation (of whatever kind or nature) that may be due to me from the Company. Finally, I also understand and agree that upon termination of my employment/association with the Company (for any reason whatsoever), the Company shall have the right to notify my prospective employer of the existence of this Agreement, and I release and hold the Company harmless from any adverse consequences that may result therefrom.

7.      I further acknowledge and understand that my violation of any of the above covenants or restrictions will result in irreparable harm to the Company, and that an award of money damages, alone, will not be adequate to remedy such harm.   Consequently, in the event that I violate any of the above covenants or restrictions, the Company, in addition to any other rights and remedies provided under law, shall be entitled to both: (a) a preliminary or permanent injunction in order to prevent the continuation of such harm; and (b) money damages, insofar as they can be reasonably determined, including, without limitation, all reasonable costs and attorneys' fees incurred by the Company in enforcing the provisions of this Agreement;

8.      In the event that any provision of this Agreement shall be found by a court of competent jurisdiction to be invalid or unenforceable as written as a matter of law, such court(s) may exercise its discretion in reforming such provision(s) such that I shall be subject to nondisclosure, non-solicitation/noninterference and intellectual property assignment covenants that are determined by the court to be reasonable under the circumstances and enforceable by the Company;

9.  I acknowledge that I am prohibited from initiating and/or responding to any correspondence via any social media or my personal email account that pertains to any Company- related business or issues;

10.     In addition to the above obligations and covenants, I, by my execution of this Agreement in the space provided below, also acknowledge a copy of the Company's Privacy Policy, and shall correspondingly abide by the requirements thereof relative to *Confidential Information*;

11. I acknowledge receipt of a copy of the attached **Schwab Advisor Network Contact Policy.**

12.     This Agreement supersedes and replaces, in its entirety, all previous agreement(s), written, verbal or otherwise, relative to the subject matter hereof. However, for any reason; should this Agreement (or any portion(s) hereof) be declared invalid or unenforceable, I shall then be subject to, and bound by, the covenants and restrictions contained in any previous agreement executed by me relative to the subject matter hereof; and,

13.     To the extent not inconsistent with applicable law, I acknowledge and agree that this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, and the venue (i.e., location) for the resolution of any dispute or controversy shall be the County of Worcester, Commonwealth of Massachusetts. I understand that the confidentiality and non-disclosure provisions above do not serve as a waiver of my rights under state and federal securities law and rules, to the extent applicable.

14.     The above notwithstanding, I understand that I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that:

- is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law; or,
- that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

I also hereby acknowledge, understand and accept that: (1) my employment/association is "at will" and that this Agreement does not cause an employment/association for any term; and (2) the Company may, at its discretion, and at any time, conduct (or hire an unaffiliated service to conduct) a background review, including a review of my civil and criminal history, credit history, CRD record, and I hereby consent to such reviews.

I acknowledge, understand and accept my obligations under this Agreement. I also acknowledge, understand and accept that this Agreement does not cause an employment/association for any term.  I specifically acknowledge that the covenants set forth herein regarding *Confidential Information* and restricting disclosure thereof, solicitation/interference, and acknowledging ownership of intellectual property are reasonable, appropriate and necessary for the protection of the Company's legitimate business interests. I further acknowledge and agree that I have been provided with good and valuable consideration in return for my execution of this Agreement.

DocuSigned by:

*Brian Carlson*

846756DF11FE41B...

Signature

5/31/2023

Date



# MIRICK O'CONNELL

A T T O R N E Y S    A T    L A W

Brian M. Casaceli
Mirick O'Connell
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
bcasaceli@mirickoconnell.com
t 508.860.1478
f 508.983.6283

April 30, 2024

**VIA EMAIL AND CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Dr. Charles Lieberman
Chief Investment Officer
Advisors Capital Management, LLC
10 Wilsey Square, Suite 200
Ridgewood, NJ 07450

Re:  **Brian G. Carlson -- CEASE AND DESIST DEMAND by Grimes & Company, Inc.**

Dear Dr. Lieberman:

Please be advised that this Firm represents Grimes & Company, Inc. ("Grimes" or the "Company") of Westborough, Massachusetts. We are writing with respect to the employment of Brian G. Carlson, a former employee of Grimes, by your firm, Advisors Capital Management, LLC ("ACM"). In his new position, it appears that Mr. Carlson has engaged in conduct in violation of a Confidentiality and Restrictive Covenant Agreement (the "Agreement") he signed during his employment with Grimes.

**DEMAND IS HEREBY MADE THAT MR. CARLSON IMMEDIATELY CEASE AND DESIST HIS VIOLATIVE ACTIVITY ON ACM'S BEHALF AND THAT YOU PROVIDE WRITTEN CONFIRMATION THAT HE HAS DONE SO.**

As set forth in the separate communication to Mr. Carlson, he entered into and is bound by the Agreement. The Agreement contains several restrictive covenants governing his conduct following the termination of his employment. In particular, given Mr. Carlson's access to the Company's Confidential Information (as that term is defined in the Agreement) and clients and information pertaining to their investment objectives, service requirements, and fees charged, he agreed that, following his termination of employment with the Company for any reason, he would not, directly or indirectly, in any manner whatsoever:

[N]either solicit to render, nor *render or accept*, as a principal, agent, employee, consultant, stockholder, partner, member, officer, director or in any other capacity, for the benefit of any person or entity other than the Company, any investment advisory (i.e., investment management, financial planning, and related consulting

---

services) or securities and insurance sales or brokerage (including the sale of any investment or insurance product) business from/to: (i) any person or entity who is a client (exclusive of [your] family members) of the Company at the inception of [your] employment/association, or becomes a client of the Company during the term of [your] employment/association....

Very recently, the Company learned that Mr. Carlson has been in contact with a Company client and is facilitating a transfer of that client's assets from the Company to ACM. Mr. Carlson's conduct is undeniable, as the client inadvertently sent an email to the Company intended for Mr. Carlson. Mr. Carlson's conduct blatantly violates his obligations under the Agreement. His improper and unlawful conduct must cease immediately.

We also demand that Mr. Carlson disclose all solicitations made by him on behalf of ACM to Grimes' clients, as well as any services he has rendered to, or business he has accepted from, any Grimes' clients since the end of his employment with Grimes. We will then cross-check that list against Grimes' client list to determine whether it has been harmed by any violative conduct.

Finally, we demand that ACM conduct a search of its physical and electronic files to ensure that no Confidential Information of Grimes is in ACM's possession. To the extent that ACM locates any Confidential Information in its possession, ACM must return all such Confidential Information to Grimes immediately and retain no physical or electronic copies.

Your failure to respond may result in Grimes having no choice but to pursue its legal rights and remedies against ACM. If we have not heard from you by the close of business on **Monday, May 6, 2024**, we will assume that you do not intend to comply with this demand. In that event, Grimes will take appropriate steps to enforce its rights judicially and seek all remedies to which it is entitled.

We look forward to your prompt response.

Very truly yours,

Brian M. Casaceli

Enclosures

cc:    Grimes & Company
       Brian G. Carlson

Date Filed 5/22/2024 12:02 PM
Superior Court - Worcester
Docket Number

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Brian G. Carlson
12 Amberwhite Rise
Pittsford, NY 14534

9590 9402 7394 2055 9111 81

2. Article Number (Transfer from service label)

9589 0710 5270 1400 8834 81

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by (Printed Name) | C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery ($500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Return Receipt

PS Form 3811, July 2020 PSN 7530-02-000-9053                Domestic Return Receipt

Date Filed 5/22/2024 12:02 PM
Superior Court - Worcester
Docket Number

USPS TRACKING #

9590 9402 7394 2055 9111 61

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States**
**Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•



Brian M. Cusuleli
Mirick O'Connell
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926

28434-2 BMC/Smd

# EXHIBIT E

# MIRICK O'CONNELL

ATTORNEYS AT LAW

Brian M. Casaceli
Mirick O'Connell
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
bcasaceli@mirickoconnell.com
t 508.860.1478
f 508.983.6283

April 30, 2024

**VIA EMAIL AND CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Dr. Charles Lieberman
Chief Investment Officer
Advisors Capital Management, LLC
10 Wilsey Square, Suite 200
Ridgewood, NJ 07450

Re: **Brian G. Carlson – CEASE AND DESIST DEMAND by Grimes & Company, Inc.**

Dear Dr. Lieberman:

Please be advised that this Firm represents Grimes & Company, Inc. ("Grimes" or the "Company") of Westborough, Massachusetts. We are writing with respect to the employment of Brian G. Carlson, a former employee of Grimes, by your firm, Advisors Capital Management, LLC ("ACM"). In his new position, it appears that Mr. Carlson has engaged in conduct in violation of a Confidentiality and Restrictive Covenant Agreement (the "Agreement") he signed during his employment with Grimes.

**DEMAND IS HEREBY MADE THAT MR. CARLSON IMMEDIATELY CEASE AND DESIST HIS VIOLATIVE ACTIVITY ON ACM'S BEHALF AND THAT YOU PROVIDE WRITTEN CONFIRMATION THAT HE HAS DONE SO.**

As set forth in the separate communication to Mr. Carlson, he entered into and is bound by the Agreement. The Agreement contains several restrictive covenants governing his conduct following the termination of his employment. In particular, given Mr. Carlson's access to the Company's Confidential Information (as that term is defined in the Agreement) and clients and information pertaining to their investment objectives, service requirements, and fees charged, he agreed that, following his termination of employment with the Company for any reason, he would not, directly or indirectly, in any manner whatsoever:

[N]either solicit to render, nor *render or accept*, as a principal, agent, employee, consultant, stockholder, partner, member, officer, director or in any other capacity, for the benefit of any person or entity other than the Company, any investment advisory (i.e., investment management, financial planning, and related consulting

---

services) or securities and insurance sales or brokerage (including the sale of any investment or insurance product) business from/to: (i) any person or entity who is a client (exclusive of [your] family members) of the Company at the inception of [your] employment/association, or becomes a client of the Company during the term of [your] employment/association....

Very recently, the Company learned that Mr. Carlson has been in contact with a Company client and is facilitating a transfer of that client's assets from the Company to ACM. Mr. Carlson's conduct is undeniable, as the client inadvertently sent an email to the Company intended for Mr. Carlson. Mr. Carlson's conduct blatantly violates his obligations under the Agreement. His improper and unlawful conduct must cease immediately.

We also demand that Mr. Carlson disclose all solicitations made by him on behalf of ACM to Grimes' clients, as well as any services he has rendered to, or business he has accepted from, any Grimes' clients since the end of his employment with Grimes. We will then cross-check that list against Grimes' client list to determine whether it has been harmed by any violative conduct.

Finally, we demand that ACM conduct a search of its physical and electronic files to ensure that no Confidential Information of Grimes is in ACM's possession. To the extent that ACM locates any Confidential Information in its possession, ACM must return all such Confidential Information to Grimes immediately and retain no physical or electronic copies.

Your failure to respond may result in Grimes having no choice but to pursue its legal rights and remedies against ACM. If we have not heard from you by the close of business on **Monday, May 6, 2024**, we will assume that you do not intend to comply with this demand. In that event, Grimes will take appropriate steps to enforce its rights judicially and seek all remedies to which it is entitled.

We look forward to your prompt response.

Very truly yours,

Brian M. Casaceli

Enclosures

cc:    Grimes & Company
       Brian G. Carlson



# MIRICK O'CONNELL

A T T O R N E Y S   A T   L A W

Brian M. Casaceli
Mirick O'Connell
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
bcasaceli@mirickoconnell.com
t 508.860.1478
f 508.983.6283

April 30, 2024

**VIA EMAIL AND CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Brian G. Carlson
12 Ambergate Rise
Pittsford, NY 14534

Re: **CEASE AND DESIST DEMAND by Grimes & Company, Inc.**

Dear Mr. Carlson:

Please be advised that this Firm represents Grimes & Company, Inc. ("Grimes" or the "Company") of Westborough, Massachusetts, your former employer. We are writing with respect to your current employment with the wealth management team of Advisors Capital Management, LLC ("ACM"). It is apparent that you have violated your continuing obligation to Grimes as set forth in detail below in connection with your new position with ACM.

**DEMAND IS HEREBY MADE THAT YOU IMMEDIATELY CEASE AND DESIST YOUR VIOLATIVE ACTIVITIES WITH ACM AND THAT YOU PROVIDE WRITTEN CONFIRMATION THAT YOU HAVE DONE SO.**

As you are undoubtedly aware, on May 31, 2023, you executed the Confidentiality and Restrictive Covenant Agreement ("the "Agreement), a copy of which is enclosed herewith. The purpose of the Agreement was to "protect the Company's legitimate interests in its client relationships, and the confidential information that the Company has developed about its clients, operations, markets, and services." To that end, the Agreement contains several provisions governing your conduct both during and following the termination of your employment.

As you know, during your employment with the Company, you had access to the Company's Confidential Information – as that term is defined in the Agreement – as well as its clients and information pertaining to their investment objectives, service requirements, and fees charged. In recognition of the foregoing, you expressly agreed that, for a period of twenty-four (24) months following your termination of employment with the Company for any reason, you would not, directly or indirectly, in any manner whatsoever:

MIRICK O'CONNELL

Brian G. Carlson
April 30, 2024
Page 2

[N]either solicit to render, nor *render or accept*, as a principal, agent, employee, consultant, stockholder, partner, member, officer, director or in any other capacity, for the benefit of any person or entity other than the Company, any investment advisory (i.e., investment management, financial planning, and related consulting services) or securities and insurance sales or brokerage (including the sale of any investment or insurance product) business from/to: (i) any person or entity who is a client (exclusive of [your] family members) of the Company at the inception of [your] employment/association, or becomes a client of the Company during the term of [your] employment/association....

Despite the clarity of the foregoing restriction, the Company recently learned that you have been in contact with a Company client and are facilitating a transfer of that client's assets from the Company to your new employer, ACM. Indeed, based on an email the client mistakenly sent Grimes, there is no doubt about your inappropriate involvement behind the scenes. Your conduct blatantly violates your agreement not to render or accept investment advisory business from a Company client for a period of twenty-four months. Your conduct is particularly egregious given that you specifically acknowledged that the "covenants set forth [in the Agreement] regarding Confidential Information and restricting disclosure thereof [and] solicitation/interference... are reasonable, appropriate and necessary for the protection of the Company's legitimate business interests."

Notably, in Section 7 of the Agreement, you acknowledged and expressed understanding that your violation of any of the covenants in the Agreement would "result in irreparable harm to the Company" and that the Company would be entitled to both "(a) a preliminary or permanent injunction in order to prevent the continuation of such harm; and (b) money damages, insofar as they can be reasonable determined, including, without limitation, all reasonable costs and attorneys' fees incurred by the Company in enforcing the provisions of this Agreement[.]"

**The Company demands that you immediately cease and desist from the unlawful conduct described herein and abide by the restrictions in the Agreement now and on a going forward basis.** We also demand that you disclose all solicitations made by you on behalf of ACM to Grimes' clients, as well as any services you have rendered to, or business you accepted from, any Grimes' clients since the end of your employment with the Company. We will then cross-check that list against Grimes' client list to determine whether it has been harmed by any violative conduct. Moreover, to the extent you are in possession of any Confidential Information, you must immediately identify and return such information to Grimes; you must retain no physical or electronic copies.

In addition, considering that your unlawful actions caused a direct financial loss for the Company, the Company demands that you remit payment to it in the amount of $27,000, which represents the estimated fees the Company would have received over the next two years servicing this client's account, as well as its reasonable attorneys' fees.

## MIRICK O'CONNELL

Brian G. Carlson
April 30, 2024
Page 3

     If we have not heard from you by the close of business on **Monday, May 6, 2024,** indicating your intent to cease and desist from the above activities, abide by the Agreement going forward, and pay the Company's damages, we will assume that you do not intend to comply with this demand. In that event, the Company will take appropriate steps to enforce its rights judicially and seek all remedies to which it is entitled.

     We look forward to your prompt response.

Very truly yours,

Brian M. Casaceli

Enclosures


cc:    Grimes & Company
       Advisors Capital Management, LLC

DocuSign Envelope ID: 29647CD9-046F-42A4-8283-7DA55DD7E10A



# GRIMES
### AND COMPANY

## CONFIDENTIALITY *and* RESTRICTIVE COVENANT AGREEMENT

I, Brian Carlson , acknowledge and fully understand the need to keep completely confidential the business practices and operations of Grimes & Company, Inc., and each of its and their affiliated persons and entities, successors and assigns (together, the "Company). In consideration of my initial and continued employment/association with the Company, **I hereby acknowledge and affirm my obligations to the Company, and I agree to be bound by the following terms of this Agreement:**

1.       I acknowledge that the purpose of this document is to protect the Company's legitimate interests in its client relationships, and the confidential information that the Company has developed about its clients, operations, markets, and services;

2.       During the course of my employment/association, I may have access to, and become familiar with, confidential information, proprietary information and/or trade secret information, and documentation related thereto, belonging to the Company or its clients regarding its investment advisory operations, methods and practices, including, but not limited to, books, records, lists, computer programs, and other information or documents regarding the Company's revenues, business methods, investment advisory processes and practices (which includes financial planning and investment management), marketing strategies and plans, and referral sources, as well as information pertaining to the Company's past, present and prospective clients, including, but not limited to, identity, address, e-mail address, telephone numbers, telefax numbers, account numbers, investment objectives, service requirements, and fees charged, and the Company's past, present and prospective referral sources, including, but not limited to, identity, address, e-mail address, telephone numbers, telefax numbers, and fee arrangement (all such confidential, proprietary and trade secret information and documentation is referred to herein as the "*Confidential Information*").  I acknowledge that such *Confidential Information* is owned, and shall continue to be owned, solely by the Company, regardless of whether or not I introduced a client to the Company or caused the receipt of such *Confidential Information* by the Company. During the term of my employment/association, and forever thereafter (regardless of the circumstances surrounding termination), I agree not to use, communicate, reveal or otherwise make available such *Confidential Information* for any purpose whatsoever, nor will I divulge (or cause to be divulged) any such *Confidential Information* to any person, partnership, corporation or entity other than the Company except: (i) in furtherance of my employment duties to the Company; (ii) as required to testify truthfully before, or otherwise assist in any investigation or proceeding brought by the U.S. Securities and Exchange Commission, any state or federal regulatory body, or any law enforcement agency or other legislative body; or (iii) to the U.S. Securities and Exchange Commission about a possible securities law violation in conformity with the "Whistleblower Regulations" under Section 21F of the Securities Exchange Act of 1934 including all related rules and provisions.  Except with respect to the "Whistleblower Regulations," upon termination of my employment/association, or at any other time that the Company may so request, I shall immediately deliver to the Company all such *Confidential Information*, including, but not limited to, all papers, notes, lists, computer programs, reports, books, records and all other documents (and all copies thereof) relating to the Company as made reference to above, which I may then possess or have under my control. The above restrictions apply to all *Confidential Information* regardless of the format in which it is created or maintained (hard copy, electronic, or otherwise), or where it is maintained, including, but not limited to, all computer(s) that you may possess or have access to away from the Company's offices.  *Confidential Information* shall not include information that I possessed prior to my association with the Company or information that is within the public domain.

In addition, to the extent that I provide services to and/or for any Company proprietary investment program, model, fund, process or otherwise, I acknowledge and agree that the Company owns all right, title and interest in and to any such program, model, fund, process or otherwise, and that Company shall continue to own

DocuSign Envelope ID: 29647CD9-046F-42A4-8283-7DA55DD7E10A

all such programs, models, funds and processes subsequent to termination of my association with the Company, for any reason. Upon such termination, I shall not, directly or indirectly, use or reference the Company or any such programs, models, funds, processes or otherwise without the express prior written consent of Company.

3.       Except as may be required in the ordinary course of discharging my duties to the Company, I agree not to remove from the Company's office (and represent to the Company that I have not previously removed, and do not currently have in my possession outside the premises of Company's office) any of the *Confidential Information* made reference to in paragraph 2 above, including, but not limited to, Company books, records, documents, lists, computer programs, or client documents and/or client information or lists, or any copies of such books, records, documents, lists, computer programs, or client documents and/or client information or lists, without the express prior written consent of Michael Davide, Chief Compliance Officer, or such other designated Company principal, and in the event such written consent is received, then such *Confidential Information* shall be immediately returned to the Company's office within the earlier of your completion of the project or task for which the *Confidential Information* was necessary or the demand for return of the *Confidential Information* by Michael Davide, Chief Compliance Officer, or such other designated Company principal;

4.       To the extent not contrary to applicable state law, I acknowledge and agree that any and all inventions, discoveries, improvements, trademarks, copyrightable work, or other intellectual property created, produced, designed and/or developed, in whole or in part, individually or jointly with others, during the term of my employment/association with the Company, which is/are directly or indirectly within the scope of the Company's past, current or planned future operations, are the Company's exclusive property, and shall be immediately disclosed and assigned to the Company. I further agree that any and all such applicable item(s) is a *work made for hire* for the Company within the definition of Section 101of Title 17 of the United States Code, or any successor provision, and any corresponding state law provisions. My above obligations to the Company shall be continuous and ongoing and shall survive the termination of this Agreement;

5.       I fully acknowledge and understand that my violation of any of the above covenants while I am employed by/associated with the Company, may, in addition to all other remedies available to the Company, result in the immediate termination of my employment/association;

6.       In recognition of the highly confidential and proprietary nature of the Company's business methods and practices, I, during my employment/association with the Company, and for a period of twenty-four months (24) months subsequent to termination of my employment/association for any reason (regardless of the circumstances surrounding termination), shall not, directly or indirectly, in any manner whatsoever:

a) neither solicit to render, nor render or accept, as a principal, agent, employee, consultant, stockholder, partner, member, officer, director or in any other capacity, for the benefit of any person or entity other than the Company, any investment advisory (i.e. investment management, financial planning, and related consulting services) or securities and insurance sales or brokerage (including the sale of any investment or insurance product) business from/to: (i) any person or entity who is a client (exclusive of my family members) of the Company at the inception of my employment/association, or becomes a client of the Company during the term of my employment/association, unless otherwise specifically excluded and set forth on an annexed Schedule "A" (which may be amended from time-to-time in writing), which Schedule "A" must be executed and dated by both the Company and me to be effective; or (ii) any person or entity identified as a prospective Company client (i.e. any and all individuals or entities contacted by [or who contacts] the Company for the purpose of becoming a Company client within the 12 month period prior to the termination of my employment/association) by me, by any other employee/associate of the Company, or by the Company, during the term of my employment/association. In the event that the Company provides services to and/or through investment advisers, broker-dealers, or any other financial services providers (and/or directly or indirectly to any clients of such

DocuSign Envelope ID: 29647CD9-046F-42A4-8283-7DA55DD7E10A

investment advisers, broker-dealers, etc.), the restrictions pertaining to the term "client" as used in this subparagraph 6a) shall also apply to all such entities; or

  b) solicit or contact any of the employees/associates, full-time or part-time, of the Company for the purpose of inducing them to leave the employ of/association with the Company; or

  c) solicit or contact any referral sources of the Company for the purpose of inducing them to terminate or modify their relationship with the Company, or serve as a referral source for me. In addition, in the event that I solicit any client who was introduced to the Company by a referral source, and the Company becomes subject to a financial payment or penalty as result of my solicitation, I shall be responsible for any corresponding financial payments and/or penalties that are payable by the Company to the referral source resulting from my solicitation.

  I also warrant and represent that I shall not engage in, encourage or promote any negative discussion or disclosure in any form or medium, that relates, denotes, connotes, or implies any dissatisfaction, critique or negative opinion pertaining to the Company or any of its officers, directors, owners, members, employees, representatives or agents.

  I understand that the above restrictions are not intended to deprive me of an opportunity to earn a living in the same profession as that of the Company. Rather, I agree to abide by the above restrictions in recognition of the Company's legitimate and reasonable objective to protect its business interests. I further understand my violation of any of the above covenants shall result in the unconditional forfeiture of any and all compensation (of whatever kind or nature) that may be due to me from the Company. Finally, I also understand and agree that upon termination of my employment/association with the Company (for any reason whatsoever), the Company shall have the right to notify my prospective employer of the existence of this Agreement, and I release and hold the Company harmless from any adverse consequences that may result therefrom.

7. I further acknowledge and understand that my violation of any of the above covenants or restrictions will result in irreparable harm to the Company, and that an award of money damages, alone, will not be adequate to remedy such harm. Consequently, in the event that I violate any of the above covenants or restrictions, the Company, in addition to any other rights and remedies provided under law, shall be entitled to both: (a) a preliminary or permanent injunction in order to prevent the continuation of such harm; and (b) money damages, insofar as they can be reasonably determined, including, without limitation, all reasonable costs and attorneys' fees incurred by the Company in enforcing the provisions of this Agreement;

8. In the event that any provision of this Agreement shall be found by a court of competent jurisdiction to be invalid or unenforceable as written as a matter of law, such court(s) may exercise its discretion in reforming such provision(s) such that I shall be subject to nondisclosure, non-solicitation/noninterference and intellectual property assignment covenants that are determined by the court to be reasonable under the circumstances and enforceable by the Company;

9. I acknowledge that I am prohibited from initiating and/or responding to any correspondence via any social media or my personal email account that pertains to any Company- related business or issues;

10. In addition to the above obligations and covenants, I, by my execution of this Agreement in the space provided below, also acknowledge a copy of the Company's Privacy Policy, and shall correspondingly abide by the requirements thereof relative to *Confidential Information*;

11. I acknowledge receipt of a copy of the attached **Schwab Advisor Network Contact Policy.**

DocuSign Envelope ID: 29647CD9-046F-42A4-8283-7DA55DD7E10A

12.     This Agreement supersedes and replaces, in its entirety, all previous agreement(s), written, verbal or otherwise, relative to the subject matter hereof. However, for any reason; should this Agreement (or any portion(s) hereof) be declared invalid or unenforceable, I shall then be subject to, and bound by, the covenants and restrictions contained in any previous agreement executed by me relative to the subject matter hereof; and,

13.     To the extent not inconsistent with applicable law, I acknowledge and agree that this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, and the venue (i.e., location) for the resolution of any dispute or controversy shall be the County of Worcester, Commonwealth of Massachusetts. I understand that the confidentiality and non-disclosure provisions above do not serve as a waiver of my rights under state and federal securities law and rules, to the extent applicable.

14.     The above notwithstanding, I understand that I shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that:

- is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law; or,
- that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

I also hereby acknowledge, understand and accept that: (1) my employment/association is "at will" and that this Agreement does not cause an employment/association for any term; and (2) the Company may, at its discretion, and at any time, conduct (or hire an unaffiliated service to conduct) a background review, including a review of my civil and criminal history, credit history, CRD record, and I hereby consent to such reviews.

I acknowledge, understand and accept my obligations under this Agreement. I also acknowledge, understand and accept that this Agreement does not cause an employment/association for any term. I specifically acknowledge that the covenants set forth herein regarding *Confidential Information* and restricting disclosure thereof, solicitation/interference, and acknowledging ownership of intellectual property are reasonable, appropriate and necessary for the protection of the Company's legitimate business interests. I further acknowledge and agree that I have been provided with good and valuable consideration in return for my execution of this Agreement.

---DocuSigned by:

*Brian Carlson*

---B467560F71FE4FB...

Signature

5/31/2023

Date

**SENDER:** *COMPLETE THIS SECTION*

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Dr. Charles Lieberman
Chief Investment Officer
Advisors Capital Management, LLC
10 Wilsey Square, Suite 200
Ringwood, NJ 07450

9590 9402 7394 2055 9111 98

2. Article Number *(Transfer from service label)*

9589 0710 5270 1400 8833 20

PS Form **3811**, July 2020 PSN 7530-02-000-9053

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X _____    ☐ Agent
                     ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Return Receipt

Domestic Return Receipt

| USPS TRACKING # | | First-Class Mail |
| --- | --- | --- |
| | | Postage & Fees Paid |
| | | USPS |
| | | Permit No. G-10 |

9590 9402 7394 2055 9111 98

**United States**
**Postal Service**

* Sender: Please print your name, address, and ZIP+4® in this box•

Brian M. Caswell
Mirick O'Connell
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926

28434-2  BMC/smd



COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS                                    WORCESTER SUPERIOR COURT
                                                CIVIL ACTION NO. 2485CV589 B

---

GRIMES & COMPANY, INC.
     Plaintiff,

     v.                                    **MOTION FOR PRELIMINARY
                                                INJUNCTION**

BRIAN G. CARLSON.,
     Defendant.

---

     Pursuant to Rule 65 of the Massachusetts Rules of Civil Procedure, the Plaintiff, Grimes

& Company, Inc. ("Grimes & Co."), moves for a Preliminary Injunction against its former

employee, Defendant Brian G. Carlson ("Defendant").

     As grounds therefore, and as set forth more fully in its Verified Complaint and Demand

for Preliminary and Permanent Equitable Relief, and its Memorandum in Support of the Motion

for Preliminary Injunction, Defendant has breached non-solicitation and non-disclosure

restrictive covenants set forth in a Confidentiality and Restrictive Covenant Agreement (the

"Agreement") he signed during his employment with Grimes & Co.  Defendant is now employed

by Advisors Capital Management, LLC ("ACM"), a competitor to Grimes & Co.

     Grimes & Co. is being irreparably harmed by the breaches and the misuse of its

confidential information.  By this Motion, Grimes & Co. seeks an order restraining Defendant

from such continued activity.  The primary preliminary equitable relief sought by Grimes & Co.

against Defendant would immediately restrain him from (a) soliciting Grimes & Co.'s clients

with whom he worked and/or about whom he obtained confidential information during the

course of his employment with Grimes & Co., and (b) any further use or disclosure of Grimes &

Co.'s confidential information.  In addition, the preliminary equitable relief sought by Grimes &

Co. would immediately require Defendant to disclose all confidential information of Grimes &
Co. he has retained, disclose to whom it was provided, disclose all clients of Grimes & Co. with
whom he worked and/or about whom he learned confidential information that he has solicited
since March 1, 2024, and disclose all business he (or ACM on his behalf) has accepted since
March 1, 2024, from those clients with whom he has worked and/or about whom he learned
confidential information during the course of his employment with Grimes & Co.

In light of Defendant's wrongful conduct as more fully described in the Verified
Complaint and supporting Memorandum of Law filed herewith, Grimes & Co.'s probability of
success on the merits, the substantial threat of irreparable injury to Grimes & Co., and the lack of
an adequate remedy at law, Grimes & Co.'s request for preliminary equitable relief should be
granted and the Proposed Preliminary Injunction filed herewith entered.

Grimes & Co. further requests that this Court determine that the underlying facts
establish good cause to waive security.

RESPECTFULLY SUBMITTED,

**GRIMES & COMPANY, INC.**

By its attorney,

*/s/ Brian M. Casaceli*
Brian M. Casaceli, BBO #690580
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
Phone: 508.860.1478
Fax:     508.983.6295
Email: bcasaceli@mirickoconnell.com

Dated: May 22, 2024

COMMONWEALTH OF MASSACHUSETTS



WORCESTER, SS

GRIMES & COMPANY, INC.
      Plaintiff,

      v.

BRIAN G. CARLSON,
      Defendant.

WORCESTER SUPERIOR COURT
CIVIL ACTION NO.

**MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**



This is an action brought by the Plaintiff, Grimes & Company, Inc. ("Grimes & Co." or the "Company"), against its former employee, Defendant Brian G. Carlson ("Defendant"), for breach of contract. Defendant has breached restrictive covenants set forth in a Confidentiality and Restrictive Covenant Agreement (the "Agreement") he signed during his employment with Grimes & Co. As a direct result of Defendant's wrongful conduct, Grimes & Co. has lost business and is at great risk of an erosion of its client base. Defendant is now employed by Advisors Capital Management, LLC ("ACM"), a competitor to Grimes & Co.

Grimes & Co. seeks a preliminary injunction pursuant to Rule 65 of the Massachusetts Rules of Civil Procedure against Defendant. Grimes & Co. is being irreparably harmed by Defendant's contractual breaches and misuse of its confidential information. The primary preliminary equitable relief sought by Grimes & Co. against Defendant would immediately restrain him from (a) soliciting Grimes & Co.'s clients with whom he worked and/or about whom he obtained confidential information during the course of his employment with Grimes & Co., and (b) any further use or disclosure of Grimes & Co.'s confidential information. In addition, the preliminary equitable relief sought by Grimes & Co. would immediately require Defendant to disclose all confidential information of Grimes & Co. he has retained, disclose to

whom it was provided, disclose all clients of Grimes & Co. with whom he worked and/or about whom he learned confidential information that he has solicited since March 1, 2024, and disclose all business he (or ACM on his behalf) has accepted since March 1, 2024, of Grimes & Co. clients with whom he has worked and/or about whom he learned confidential information during his employment with Grimes & Co.

In light of Defendant's wrongful conduct as more fully described herein, Grimes & Co.'s probability of success on the merits, the substantial threat of irreparable injury to Grimes & Co., and the lack of an adequate remedy at law, Grimes & Co.'s request for preliminary equitable relief should be granted and the Proposed Preliminary Injunction filed herewith entered. Grimes & Co. further requests that this Court determine that the underlying facts establish good cause to waive security.

## STATEMENT OF FACTS[1]

**A.      Grimes & Co.**

Grimes & Co. is a Registered Investment Advisor ("RIA") providing discretionary portfolio management and wealth management services for clients across the country. Grimes & Co.'s mission is to provide its clients with disciplined asset management, strong performance, and unparalleled service and support. As an RIA, Grimes & Co. maintains a contractual relationship with promoting firms including Fidelity Investments ("Fidelity") and Charles Schwab ("Schwab"). As part of these contractual arrangements, Fidelity and Schwab may refer their investor clients who express a need and/or interest in securing professional portfolio management and wealth management services to Grimes & Co. Absent the contractual

---

[1] The Statement of Facts is drawn from the factual allegations set forth in the Verified Complaint filed herewith. Internal citations have been omitted for readability purposes.

2

relationships Grimes & Co. has with Fidelity & Schwab, Fidelity & Schwab would not refer their

investor clients to Grimes & Co.

When Grimes & Co. receives a client referral from Fidelity or Schwab, it the presents its

services and a proposal to the client to retain Grimes & Co.'s discretionary portfolio

management and wealth management services.  Approximately half of the clients Grimes & Co.

services are referred by Fidelity and Schwab.  Most of the remaining clients Grimes & Co.

services are referred by existing Grimes & Co. clients.  The identity of Grimes & Co.'s clients is

not public knowledge.  Indeed, only a limited number of individuals know who among the

general public are Grimes & Co. clients who have demonstrated a specific need and desire for

the services Grimes & Co. provides.

**B.**      **Grimes & Co.'s Client Goodwill and Confidential Information**

Grimes & Co. invests significant time, effort and resources in the development of its

valuable relationships and the associated goodwill with its clients.  It is imperative that Grimes &

Co. keep its client goodwill protected to retain the competitive advantage that it has developed in

its highly competitive industry.  Grimes & Co. has also invested significant time, effort and

resources to develop confidential and proprietary information and processes to secure and

maintain its competitive advantage in its industry.

Grimes & Co. has amassed a great deal of confidential and proprietary business

information and trade secrets regarding its investment advisory operations, methods and

practices, including, but not limited to, books, records, lists, computer programs, and other

information or documents regarding the Company's revenue, business methods, investment

advisory process and practices (which includes financial planning and investment management),

marketing strategies and plans, and referral sources, as well as information pertaining to the

Company's past, present and prospective clients, including, but not limited to, identity, address,

email address, telephone numbers, telefax numbers, account numbers, investment objectives,

service requirements, and fees charged (collectively, the "Confidential Information").[2]

Grimes & Co.'s Confidential Information is highly valuable and provides Grimes & Co. a

distinct competitive advantage provided it is used exclusively by Grimes & Co. and its

employees. Indeed, with respect to Confidential Information concerning a client, no competitor

can effectively target a Grimes & Co. client and address their needs without access to or specific

knowledge of client-related Confidential Information. Simply put, the knowledge of the

Confidential Information if available to or in the possession of Grimes & Co.'s competitors

would be highly detrimental to Grimes & Co.'s ability to maintain its client relationships and

revenue derived from those clients.

Grimes & Co. undertakes a comprehensive, consistent and effective approach to

protecting its Confidential Information. This includes but is not limited to consistent messaging

to employees regarding the importance of confidentiality in offer letters, employment agreements

(such as the Agreement), and training.

In addition, Grimes & Co. has adopted (i) a comprehensive privacy policy outlining how

the Company protects the confidentiality of client information, and (ii) a written information

security policy to ensure all client information in Grimes & Co.'s possession remains strictly

confidential, and is accessed only by those employees at the Company who have a legitimate

need-to-know.

The Company also uses computer passwords and multi-factor authentication to protect

against unauthorized access to Confidential Information. Moreover, the Company sets access

restrictions applicable to its own employees to ensure that employees are only permitted access

---

[2]  The definition of Confidential Information in this Paragraph shares the same meaning as in the Agreement.

4

to Confidential Information, including client-related information, which they need to perform their job functions.

### C.    Defendant's Employment with Grimes & Co.

Defendant began his employment with Grimes & Co. on March 14, 2016. Prior to the start of his employment, and in consideration of his employment with the Company, Defendant executed a Confidentiality and Restrictive Covenant Agreement (the "2016 Agreement") containing, among other provisions, restrictive covenants governing his conduct both during and after his employment with the Company.

During his employment with Grimes & Co., Defendant held the position of Financial Advisor. As part of his job duties and responsibilities as a Financial Advisor, Defendant had access to and used Grimes & Co.'s Confidential Information in the performance of his job duties. In particular, as it relates to Grimes & Co.'s clients, Defendant was privy to their identity, address, email address, telephone numbers, telefax numbers, account numbers, investment objectives, service requirements, and fees Grimes & Co. charged. In his position with Grimes & Co., Defendant was responsible for assisting Grimes & Co. clients in identifying financial goals and working with Grimes & Co.'s portfolio management team to design investment allocations and determine strategy selections to meet clients' needs.

Defendant would regularly speak with Grimes & Co. clients over the phone, via videoconference, through email, or in-person. As part of his job, Defendant would interview clients to determine current income, expenses, insurance coverage, tax status, financial objectives, risk tolerance, and other suitable information needed to develop a financial plan and investment policy statement. Defendant was also expected to consult with clients about their financial allocations and investment strategies as they evolve over time, and to contact clients periodically to determine any changes in their financial status. Defendant was responsible for

5

interactions with clients to ensure satisfaction and maintain favorable relations. Defendant was also responsible for managing ongoing client relationships.

Approximately 90-95% of the clients with whom Defendant worked at Grimes & Co. were referred to Grimes & Co. by Fidelity and Schwab. Most of the remaining clients with whom Defendant worked were referred to Grimes by other Grimes & Co. clients or assigned to Defendant by the Company. Defendant did not develop these clients through his own contacts or leads.

During his employment and with the support and investment provided by Grimes & Co., Defendant continued to develop Grimes & Co.'s goodwill with its clients.

**D.      Defendant Executes the Agreement**

As part of Grimes & Co.'s contractual arrangement with Schwab, Schwab required Grimes & Co. to ensure that all of its employees who work with clients referred by Schwab abide by certain policies, including confidentiality and non-solicitation restrictions. Consistent with Schwab's requirement, in May 2023, Grimes & Co. provided those of its employees who desired to continue to receive client referrals from Schwab with an updated confidentiality and restrictive covenant agreement attaching a copy of the Schwab Advisor Network Contact Policy. Grimes & Co. presented Defendant with the Agreement to review.

On May 31, 2023, in consideration of his continued employment and the ability to continue to receive client referrals from Schwab, Defendant executed the Agreement. A true and genuine copy of the Agreement is attached as **Exhibit A** to the Verified Complaint. If Defendant had not executed the Agreement, he would not have been permitted to continue to receive client referrals from Schwab. The Agreement superseded the 2016 Agreement. The Agreement outlined Defendant's obligations both during and after his employment. Section 2 of the Agreement, quoted in ¶ 35 of the Verified Complaint, establishes a confidentiality restriction (the

6

"Confidentiality Clause"), and Section 6 of the Agreement, quoted in ¶ 36 of the Verified

Complaint, contains non-solicitation restrictions (the "Non-Solicitation Clause").

On March 1, 2024, Grimes & Co. terminated Defendant's employment.  Upon his

termination of employment, Grimes & Co. sent Defendant a copy of the Agreement and

reminded him of his post-employment obligations to the Company, including the Confidentiality

Clause and the Non-Solicitation Clause.   Grimes & Co. performed all of its obligations owed to

Defendant during his employment and as part of the Agreement.

### E.   Defendant's Affiliation with Advisors Capital Management, LLC

On or about April 9, 2024, Grimes & Co. learned that Defendant became affiliated with

the wealth management team of Advisors Capital Management, LLC ("ACM").  Defendant's

title with ACM is "Senior Wealth Advisor."  ACM is a competitor to Grimes & Co.  Defendant's

biography on ACM's website states:

> Brian G. Carlson, CFP® is a Senior Wealth Advisor with ACM Wealth. He works
> with clients to create customized financial plans that align with their actively
> managed portfolios to achieve their long-term goals. As a CERTIFIED
> FINANCIAL PLANNER™ practitioner, Brian focuses on developing a
> comprehensive holistic financial plan for each client and implementing tailored
> investment strategies. Brian enjoys building meaningful relationships to better
> serve as a fiduciary and address the specific needs of each client.  Prior to joining
> ACM in April 2024, *Brian guided over 150 families as a financial advisor from
> 2016-2024 at Grimes & Company, a nationally ranked RIA.* (Emphasis added).

See **Exhibit B** to the Verified Complaint.

As described in the above biography, Defendant's job duties and responsibilities as a

Senior Wealth Advisor with ACM very closely align with his job duties and responsibilities as a

Financial Advisor for Grimes & Co.

### F.   Defendant's Use of Confidential Information and Solicitation of Grimes & Co.'s Clients

As articulated in ¶¶ 43-75 of the Verified Complaint, since his employment with Grimes

& Co. ended on March 1, 2024, Defendant has impermissibly used Grimes & Co.'s Confidential

7

Information and unlawfully solicited business from clients with whom he worked at Grimes & Co. Defendant's actions in this regard constitute blatant violations of the Non-Solicitation Clause and Confidentiality Clause.

Once it learned of Defendant's inappropriate conduct, Grimes & Co. – through its counsel – sent a demand letter to Defendant reminding him of his contractual obligations and demanding that he cease and desist from his wrongful activities. A true and genuine copy of the cease-and-desist demand dated April 30, 2024, is attached to the Verified Complaint as **Exhibit D**. On the same day, Grimes & Co. – through its counsel – sent a demand letter to ACM advising ACM of Defendant's contractual obligations, and demanding that ACM ensure that Defendant's violative conduct cease immediately. A true and genuine copy of the cease-and-desist demand dated April 30, 2024, is attached to the Verified Complaint as **Exhibit E**. Defendant has not discontinued his wrongful conduct.

## **ARGUMENT**

Before a preliminary injunction may issue, the Court must review four factors: (1) the movant's likelihood of success on the merits; (2) the danger that the movant will suffer irreparable harm if the injunction is not granted; (3) the risk that the defendant will be harmed more by the grant of injunctive relief; and (4) the harm to the public interest if the injunction is issued. <u>Packaging Industries Group, Inc. v. Cheney</u>, 380 Mass. 609, 617 (1980). Grimes & Co. satisfies each of these requirements, and, as a result, the requested relief should be granted, and the Proposed Preliminary Injunction filed herewith should enter.

### A.     **Plaintiff Is Likely To Succeed On The Merits Of Its Claim.**

An agreement containing restrictive covenants like the one at issue here "will be enforced if it is reasonable, based on all the circumstances." <u>All Stainless, Inc. v. Colby</u>, 364 Mass. 773, 778 (1974). Indeed, under well-established Massachusetts precedent, an employer may enforce a

8

non-solicitation agreement to the extent necessary to protect the employer's legitimate business
interests which include guarding against the release or use of trade secrets or other confidential
information, or other harm to the employer's goodwill.  Id. at 778-80; see also Marine
Contractors Co. v. Hurley, 365 Mass. 280, 287 (1974) (a non-solicitation provision "generally
[is] enforceable only to the extent that [it is] necessary to protect the legitimate business interests
of the employer.")  Unlike a covenant not to compete – which is not at issue here – "time-bound
non-solicitation…obligations… are less restrictive than other covenants that Massachusetts
courts frequently uphold.")  Corporate Techs., Inc. v. Harnett, 943 F. Supp. 2d 233, 245 (D.
Mass. 2013).

     1.    *The Non-Solicitation Clause Prohibiting Defendant from Soliciting Grimes &*
          *Co.'s Clients Is Reasonable*

In deciding whether a restrictive covenant is reasonable, this Court must consider, among
other things, the "reasonable needs of the former employer for protection against harmful
conduct of the former employee[,]" the "reasonableness of the restraint imposed on the former
employee[,]" the geographic scope of the covenant and its duration, and the "public interest" as a
whole. All Stainless, Inc., 364 Mass. at 778.  The Non-Solicitation Clause Grimes & Co. seeks
to enforce in this case passes this test.

          a.    The Non-Solicitation Clause Protects Grimes & Co.'s Legitimate Business
                Interests

The business interests that Grimes & Co. seeks to protect via the Non-Solicitation Clause
fall squarely within the categories held protectable – namely, confidential information and client
goodwill. Boulanger v. Dunkin' Donuts Inc., 442 Mass. 635, 641 (2004).  Defendant explicitly
acknowledged this fact when he executed the Agreement.  See ¶ 1 of Exhibit A to the Verified
Complaint (acknowledging that the "purpose of th[e] [Agreement] [wa]s to protect the
Company's legitimate interests in its client relationships, and the confidential information that

the Company has developed about its clients, operations, markets, and services.")

The primary thrust of the Non-Solicitation Clause is to protect against the potential loss of Grimes & Co.'s client goodwill – a sufficient basis to support enforcement. North American Expo. Company v. Corcoran, 452 Mass. 852, 869-70 (2009). Here, there can be no doubt that the Defendant, whose job required him to interface directly and frequently with Grimes & Co.'s clients, is in a unique position to capitalize on and usurp Grimes & Co.'s client goodwill.

In addition to client goodwill, the Non-Solicitation Clause is designed to protect Grimes & Co.'s Confidential Information. As discussed above, during his employment, Defendant had access to, and used in the performance of his job, Grimes & Co.'s Confidential Information. Clearly, were Grimes & Co.'s Confidential Information to fall into the wrong hands or (continue to) be misused by Defendant, such information could easily facilitate a competitor like ACM's efforts to solicit Grimes & Co.'s clients.

> b.    The Restraints Grimes & Co. Seeks to Enforce Are Reasonable

At the outset, it is important to note that the Agreement does not prohibit Defendant from working for a competitor; to that end, Grimes & Co. is not seeking to enjoin Defendant from working for ACM. Grimes & Co. does, however, want to ensure that Defendant is reasonably restrained from engaging in proscribed activities on behalf of ACM. Defendant acknowledged as much when he signed the Agreement. See ¶ 6 of Exhibit A to Verified Complaint ("I understand that the above restrictions are not intended to deprive me of an opportunity to earn a living in the same profession as that of the Company. Rather, I agree to abide by the above restrictions in recognition of the Company's legitimate and reasonable objective to protect its business interests.")

The Non-Solicitation Clause in this case is a reasonable restraint, and it is consistent with other non-solicitation restrictions that have been upheld under Massachusetts law. See e.g.,

Corporate Technologies, Inc., 943 F. Supp. 2d at 238; BNY Mellon, N.A. v. Schauer, 2010 WL

3326965, *8 (Mass. Super. Ct. May 14, 2010) ("There is no real dispute that… non-solicitation

provisions are generally enforceable").  Moreover, Grimes & Co. is only seeking to enforce the

Non-Solicitation Clause to prevent Defendant from soliciting to provide investment advisory

services (i.e., investment management, financial planning, and related consulting services) to

those Grimes & Co. clients with whom he worked and/or or about whom he obtained

Confidential Information during his employment.[3]  Clearly, it is with these clients – with whom

Defendant would otherwise be unfamiliar but for his employment with Grimes & Co. – that

Grimes & Co.'s goodwill and Confidential Information is most at risk from Defendant and

ACM.

     The Non-Solicitation Clause also contains a prohibition against Defendant accepting

business from Grimes & Co.'s clients.  To be clear, however, Grimes & Co. does not seek to

restrain Defendant from accepting business from Grimes & Co. clients that he did not solicit to

provide investment advisory and/or securities and insurance sales or brokerage business, but who

nonetheless contacted Defendant voluntary and without prompting by Defendant or anyone on

his behalf on and after March 1, 2024.  Rather, Grimes & Co. only narrowly seeks to restrain Mr.

Carlson from accepting business from those Grimes & Co. clients with whom he worked and/or

about whom he obtained Confidential Information that he solicits in violation of the Agreement.

Grimes & Co.'s position in this respect is reasonable, and is in alignment with this Court's

holding in Getman v. USI Holdings Corp., 2005 WL 2183159 (Mass. Super. Ct. September 1,

2005) and its progeny.

     Finally, it must be noted that in the last paragraph of the Agreement, Defendant

---

[3] Grimes & Co. also seeks to prohibit Defendant from soliciting to provide securities and insurance sales or brokerage business to those Grimes & Co. clients with whom he worked and/or or about whom he obtained Confidential Information during his employment.

"specifically acknowledge[d] that the covenants set forth [th]erein regarding… solicitation/ interference… *[were] reasonable, appropriate and necessary for the protection of the Company's legitimate business interests.*" ¶ 14 to <u>Exhibit A</u> to Verified Complaint (emphasis added). Simply put, the Non-Solicitation Clause in the manner Grimes & Co. seeks to enforce it is reasonable.

> c.    <u>The Scope Of The Non-Solicitation Clause Is Reasonable</u>

Grimes & Co. seeks to enforce the Non-Solicitation Clause to prevent Defendant from (i) soliciting to provide the same types of services he performed for Grimes & Co. *to the same clients he serviced and/or about whom he obtained Confidential Information during his employment,* and (ii) accepting business from these clients that is attributable to his unlawful solicitation. Such restrictions are narrowly tailored to protect Grimes & Co.'s legitimate business interests in protecting its customer goodwill. Moreover, considering that Defendant was employed by Grimes & Co. for over eight years, during which time he worked with hundreds of Grimes & Co. clients, a 24-month restriction on his ability to solicit is reasonable.[4]

> d.    <u>The Public Interest Is Served By The Non-Solicitation Clause</u>

As a general rule, "the public interest is served by enforcing reasonable restrictive covenants…." <u>Agero Admin. Serv. Corp. v. Campolo</u>, 366 F. Supp. 3d 170, 175 (D. Mass. 2019); <u>Perficient, Inc. v. Priorie</u>, 2016 WL 1716720, *8 (D. Mass. April 26, 2016) ("Generally, the public interest is served by enforcing contractual obligations, including reasonable restrictive covenants, between consenting parties.") (internal quotations and citations omitted). Significantly, "[n]o negative impact on the public interest results from holding [the employee] to his obligations under [an] [a]greement." <u>Iron Mountain Info. Mgmt., Inc. v. Viewpointe Archive</u>

---

[4] To the extent this Court is not inclined to enforce a 24-month non-solicitation provision, the Agreement provides that the court may "exercise its discretion in reforming such provision…" <u>See</u> ¶ 8 to <u>Exhibit A</u> to the Verified Complaint.

Servs., LLC, 707 F. Supp. 2d 92, 113 (D. Mass. 2010). Indeed, "the public has a strong interest in ensuring the protection of a company's hard-earned goodwill through the enforcement of confidentiality and non-solicitation agreements.") See Fidelity Brokerage Services, LLC v. Callinan, 2019 WL 1576097, *8, n. 8 (Mass. Super. Ct. February 11, 2019). Against the backdrop of the foregoing case law, it is apparent that the public interest weighs in favor of a finding of reasonableness.

    2.    *Defendant Breached The Non-Solicitation Clause*

Defendant definitively breached the non-solicitation clause on at least two occasions.

First, it is readily apparent that Defendant was actively soliciting M.P. to provide investment advisory services and transfer their business to ACM. Indeed, M.P. mistakenly sent an email intended for Defendant to Grimes & Co. in which M.P. referenced having a discussion with Defendant about changing from Grimes & Co. to ACM. As a result of Defendant's solicitation, M.P. has transferred their investment advisory business from Grimes & Co. to Mr. Carlson and ACM.

Second, Defendant solicited R.P. on May 2, 2024, when he spoke with them over the phone and not-so-subtly raised the subject of his new company, ACM, and indicated to R.P. if they wanted information on ACM, Defendant would provide it. Defendant's verbal communication with R.P. was unmistakably an attempt to prompt R.P. into requesting further information about ACM, which they did. R.P.'s response to Defendant's prompt was not unexpected. As this Court (Davis, J.) has noted, "[e]ven without explicit prompting, clients are likely to respond to a call from their financial advisor announcing his or her departure in a manner that offers the advisor a convenient excuse to launch into a sales pitch for his or her new employer, as appears to have happened in this case." Fidelity Brokerage Services, 2019 WL 1576097, *7, n. 7. Following their conversation, Defendant continued to solicit R.P. to provide

13

investment advisory services by sending them an email with information concerning ACM.

Defendant's conduct with respect to R.P. violated the Agreement.

3.    *The Non-Disclosure Clause Prohibiting Defendant From Using Confidential Information Is Reasonable*

      a.    <u>The Confidentiality Clause Protects Grimes & Co.'s Legitimate Business Interests</u>

It is axiomatic that a company has a legitimate business interest in its confidential and proprietary information. <u>New England Canteen Service, Inc. v. Ashley</u>, 372 Mass. 671, 674 (1977).

      b.    <u>The Restraint Grimes & Co. Seeks to Enforce Is Reasonable</u>

Grimes & Co. seeks to prohibit Defendant from using, communicating, revealing or otherwise making available Confidential Information, except as required by law. Grimes & Co. is particularly focused on ensuring that Defendant does not (i) use its Confidential Information to solicit those clients with whom he worked and/or about who he obtained Confidential Information, or (ii) disclose such Confidential Information to ACM. Grimes & Co.'s aims are reasonable. <u>See</u> <u>Jet Spray Cooler, Inc. v. Crampton</u>, 377 Mass. 159, 165 (1979) ("In the context of the employer-employee relationship, we have consistently held that where an employee acquires such confidential information in the course of his employment, he may be prohibited, after the termination of his employment, from using or disclosing confidential information so acquired") (internal quotations and citation omitted).

      c.    <u>The Scope of the Confidentiality Clause Is Reasonable</u>

Grimes & Co.'s definition of Confidential Information is eminently reasonable in light of the highly competitive industry to which it belongs. Under Massachusetts law, confidential information consists of a "compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."

J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 736 (1970) (internal quotations omitted). The information Grimes & Co. considers confidential satisfies this standard. See ¶ 2 of Exhibit A to Verified Complaint.

Particularly relevant for this case are the identities of Grimes & Co.'s clients known by Defendant. Under Massachusetts law, the identity of a business's clients is considered confidential information. See Fidelity Brokerage Services, LLC, 2019 WL 1576097 at *4-5 (holding that client identity was confidential information where the employee only became aware of the particular clients he serviced through his work with the employer).

Moreover, when measured against the six factors test in Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972) for assessing the confidentiality of information under Massachusetts law, it is clear that the identities of Grimes & Co.'s clients are confidential information. Specifically, the identities of Grimes & Co.'s clients are not known outside of its business; knowledge of client identities within the business itself are limited only to those individuals who have a business need to know; Grimes & Co. takes several steps to guard the secrecy of its client identities; the identities of Grimes & Co.'s clients would be of significant value to a competitor (like ACM); the Company incurs significant financial costs as part of the arrangements with Fidelity and Schwab from which they receive client referrals; and, although certain information about Grimes & Co.'s clients might be publicly available, the fact that an individual is a Grimes & Co. client and, therefore, has specific need for investment services is not easily acquired.

        d.    The Public Interest Is Served By the Confidentiality Clause

There can be no dispute that the Confidentiality Clause serves the public interest. See C&W Facility Servs. Inc. v. Mercado, 2018 WL 4854630, *3 (D. Mass. October 5, 2018) ("[T]he public has a general interest in… guaranteeing companies protection for their

15

confidential or proprietary information…."); <u>Fid. Brokerage Servs. LLC v. Djelassi</u>, No. 2015-2337-BLS1, slip op. at \*6 (Mass. Super. Ct. Aug. 11, 2015) (Leibensperger, J.) ("That [the former employees] now want to make money by taking advantage immediately of what [the former employer] entrusted to them, confidential client information, is hardly a justifiable interest.").

        4.    *Defendant Breached The Confidentiality Clause*

Defendant breached the Confidentiality Clause by using his knowledge of the identities of the clients with whom he worked at Grimes & Co. to contact them to solicit their business. Chief among Defendant's transgressions was his conduct involving R.P. Indeed, knowing full well that he serviced R.P. during his employment, Defendant intentionally contacted R.P.'s son who, in turn, provided Defendant with R.P.'s telephone number, which he used to contact R.P. Only by servicing R.P on behalf of Grimes & Co. did Defendant become aware of R.P. and the fact they were interested in investment advisory services.

**B.**    <u>**Plaintiff Will Be Irreparably Harmed If The Equitable Relief Requested Is Not Granted.**</u>

Grimes & Co. will suffer irreparable harm if an injunction is not entered against Defendant. Tellingly, when he executed the Agreement, Defendant, himself, explicitly "acknowledge[d] and underst[ood] that [his] violation of any of the above covenant or restrictions *will result in irreparable harm to the Company, and that an award of monetary damages, alone will not be adequate to remedy such harm.*" ¶ 7, <u>Exhibit A</u> to Verified Complaint.

"Irreparable injury" is that injury for which money damages will not compensate. <u>Sierra Club v. Larson</u>, 769 F. Supp. 420, 422 (D. Mass. 1991). A preliminary injunction should issue if there is an "actual, viable, presently existing threat of serious harm which cannot be undone."

4859-1725-9966, v. 1

Independent Federation of Flight Attendants v. Davis, 633 F. Supp. 634, 639 (D. Mass. 1986).[5]

The loss of client goodwill constitutes irreparable harm, as does the loss of confidential

information. See e.g., Bear, Stearns & Co., Inc. v. Sharon, 550 F.Sup.2d 174, 178 (D. Mass.

2008) ("[D]amage to client relationships and customer goodwill has been held to be 'irreparable

harm' under Massachusetts law.")

Significantly, Grimes & Co. can definitively establish that it has already lost one client,

M.P., to Defendant and ACM due to Defendant's unfair solicitation, and that Defendant

attempted (unsuccessfully) to solicit another, R.P.  Considering these facts, it is apparent that,

without the requested injunctive relief, Defendant will continue to use his knowledge of the

identity of Grimes & Co.'s clients with whom he worked and/or about whom he obtained

Confidential Information to contact those individuals and seek to solicit their business unfairly.[6]

This Court should prevent that from happening.

### C. The Harm To Plaintiff If The Preliminary Injunction Is Not Granted Far Outweighs The Harm To The Defendants If The Equitable Relief Is Granted.

Without the requested preliminary relief, Grimes & Co. will suffer irreparable harm,

including the immeasurable loss of business and customer goodwill described above, if

Defendant is allowed to continue soliciting Grimes & Co. clients with whom he worked and/or

about who he obtained Confidential Information.  On the other hand, any harm that Defendant

will suffer is self-inflicted in light of his egregious conduct.  This Court should view the potential

harm in the context of the Defendant's breach of the Non-Solicitation Clause and Confidentiality

Clause, as well as the fact that, in the Agreement, Defendant acknowledged and understood the

---

[5]  The occurrence of actual harm is not required if the movant can show that the risk of irreparable harm is reasonably likely. Planned Parenthood League of Mass., Inc. v. Operation Rescue, 406 Mass. 701, 710 (1990) (plaintiff must show that "without the requested relief it *may* suffer a loss of right that cannot be vindicated should it prevail after a full hearing on the merits") (citation omitted).

[6]  It bears emphasizing that Defendant's biography on ACM's website explicitly references how he "*guided over 150 families as a financial advisor from 2016-2024 at Grimes and Company.*"  Verified Complaint, ¶ 41.

possibility that if he were to violate any covenants or restrictions, the Company would be entitled to "a preliminary or permanent injunction in order to prevent the continuation of such harm." See ¶ 7, Exhibit A to Verified Complaint.

The Court should also view the potential harm in light of the fact Grimes & Co. is not seeking to prevent Defendant from working for a competitor or deprive him of an opportunity to earn a living in the same profession as that of the Company. See ¶ 6, Exhibit A to Verified Complaint. Defendant is, therefore, free to service existing ACM clients, to pursue new clients with whom he did not work and/or obtain Confidential Information during his employment with Grimes & Co., and accept business – absent any solicitation on his part – from those clients with whom he worked at Grimes & Co. Grimes & Co. simply has no other means, other than a preliminary injunction, by which to combat the unfair competition that it faces from Defendant. See Fidelity Brokerage Services, 2019 WL 1576097 at *8. For these reasons, the harm to Grimes & Co. that would result if the requested injunction is not granted outweighs any harm which the Defendant might suffer.

      **D.**      **<u>Issuance of the Requested Relief Is Not Contrary To The Public Interest.</u>**

As discussed above in Argument Sections A.1(d) and A.3(d) of this Memorandum, the public interest is served by enforcement of both the Non-Solicitation Clause (in the manner sought by Grimes & Co.) and the Confidentiality Clause. Permitting Grimes & Co. to obtain protection of the client goodwill it has developed, and its Confidential Information is consonant with the public interest.

## CONCLUSION

For the foregoing reasons, Grimes & Co. respectfully requests that its Motion for Preliminary Injunction be allowed, and the Proposed Preliminary Injunction filed herewith be entered.[7]

GRIMES & COMPANY, INC.

By its attorney,

*/s/ Brian M. Casaceli*

Brian M. Casaceli, BBO #690580
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
Phone: 508.860.1478
Fax:     508.983.6295
Email: bcasaceli@mirickoconnell.com

Dated:  May 22, 2024

---

[7]  Mass. R. Civ. Pro. 65(c) provides that security is to be required from the applicant for preliminary injunctive relief unless the Court in the exercise of its discretion determines for good cause that the requirement of security should be waived.  No security should be required.  For the reasons set forth above, absent immediate injunctive relief, Grimes & Co. will suffer irreparable harm.  The Defendant will continue to use Grimes & Co.'s Confidential Information to contact the client he serviced and/or about whom he obtained Confidential Information and seek to solicit them unfairly.  <u>Damaskos v. Board of Appeal of Boston</u>, 359 Mass. 55, 63-4 (1971) ("the matter of requiring security in each case rests in the discretion of the judge").  In the alternative, if this Court believes that security should be required, it is requested that it be in only a nominal amount.

19

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS

WORCESTER SUPERIOR COURT
CIVIL ACTION NO.

GRIMES & COMPANY, INC.
     Plaintiff,

    v.

BRIAN G. CARLSON.,
     Defendant.

**PROPOSED PRELIMINARY INJUNCTION**

Pursuant to Rule 65 of the Massachusetts Rules of Civil Procedure, the Plaintiff, Grimes & Company, Inc. (the "Plaintiff" or "Grimes & Co."), has requested that this Court enter a Preliminary Injunction against the Defendant Brian G. Carlson ( "Defendant").

This Court after a full hearing of which notice was provided to Defendant and he was given an opportunity to be heard, hereby grants the request of the Plaintiff. The Court finds that Grimes & Co. satisfies the elements necessary to obtain preliminary equitable relief.

1.     Grimes & Co. has a clear probability of success on the merits.

2.     Based upon the efforts already made by the Defendant and the impact of those efforts, there is a clear and present danger of continuing irreparable injury to Grimes & Co. If the Defendant is permitted to undermine Grimes & Co.'s business through impermissible solicitation and misuse of its own confidential information, Grimes & Co. will clearly lack an adequate remedy at law.

3.     The balance of the likelihood of success and the harms associated with granting or denying the requested injunction favors Grimes & Co.

4.     The issuance of the requested injunction is consistent with the public interest.

**It is therefore hereby ordered that a Preliminary Injunction be entered as follows:**

<u>PRELIMINARY INJUNCTIVE RELIEF</u>

That a Preliminary Injunction be entered restraining and enjoining the **Defendant Brian G. Carlson** as follows:

1.     *Disclosure of Solicitations of Clients.* Defendant is ordered to immediately disclose all solicitations, conversations, or efforts made by him on his own behalf or on behalf of Advisors Capital Management, LLC ("ACM"), or any other person, business, company, corporation, entity or firm which competes with Grimes & Co., to divert or take away investment advisory (i.e., investment management, financial planning, and related consulting services) and/or securities and insurance sales or brokerage (including the sale of any investment or insurance product) business from any of those clients with whom he worked and/or about whom he acquired Confidential Information during his employment with Grimes & Co. (hereinafter "Clients") since March 1, 2024.[1]

2.     *Discontinue Solicitations of Clients.*  With respect to any of the Clients, Defendant is hereby restrained from contacting or soliciting said Clients, or diverting or attempting to divert business of said Clients away from Grimes & Co. or otherwise interfering with Grimes & Co.'s relationship with any of said Clients.  This Preliminary Injunction specifically restricts Defendant from any further efforts to solicit, divert, or take away investment advisory and/or securities and insurance sales or brokerage business from any Clients.

---

[1]  For purposes of this Order, Confidential Information shall be defined as: confidential and proprietary business information and trade secrets regarding its investment advisory operations, methods and practices, including, but not limited to, books, records, lists, computer programs, and other information or documents regarding the Company's revenue, business methods, investment advisory process and practices (which includes financial planning and investment management), marketing strategies and plans, and referral sources, as well as information pertaining to the Company's past, present and prospective clients, including, but not limited to, identity, address, email address, telephone numbers, telefax numbers, account numbers, investment objectives, service requirements, and fees charged.

2

3.      *Disclosure of Acceptance of Business from Clients.*  Defendant is ordered to immediately disclose all investment advisory and/or securities and insurance sales or brokerage business he or ACM (as a result of Defendant's solicitation) has accepted from Clients since March 1, 2024.

4.      *Non-Acceptance of Business from Clients.*  Defendant, on his own behalf or on behalf of ACM or any other person, business, company, corporation, entity or firm is hereby restrained from rendering or accepting any investment advisory and/or securities and insurance sales or brokerage business from any Clients that result from Defendant's solicitation in violation of the Agreement.[2]

5.      *Identification of Disclosed Confidential Information.*  With respect to any Confidential Information including, but not limited to, information concerning Grimes & Co.'s clients, disclosed by Defendant to ACM or any other person, business, company, corporation, entity or firm, Defendant is ordered to immediately identify to Grimes & Co. all such information disclosed.  With respect to this identification, Defendant must include (a) the nature of the information, (b) the date of disclosure, (c) the nature of the disclosure, (d) the purpose of the disclosure, (e) the use made of the information disclosed, and (e) the name and position of all employees of ACM or any other person, business, company, corporation, entity or firm which competes with Grimes & Co., to whom such disclosures have been made.

6.      *Delivery of Confidential Information.*   Defendant is ordered to deliver all Confidential Information in his possession to Grimes & Co.  In conjunction with the delivery of

---

[2]   This Preliminary Injunction does not enjoin Defendant from accepting business from Grimes & Co. Clients that he did not solicit to provide investment advisory and/or securities and insurance sales or brokerage business, but who nonetheless contact Defendant voluntary and without prompting by Defendant or anyone on his behalf. Moreover, this Preliminary Injunction does not enjoin Defendant from providing services to those Clients who have already transferred their business to him and ACM as of the date of this Order.

3

said Confidential Information, Defendant shall make copies to be retained by counsel to be used solely for the purposes of this litigation.

7. *Deletion of Confidential Information.* With respect to any Confidential Information Defendant may have in his possession, he is ordered to permanently delete said Confidential Information and certify under oath to this Court that he has done so.

8. *Restraint on Disclosure or Use of Confidential Information.* Defendant is hereby restrained from further use or disclosure of the Confidential Information of Grimes & Co.

For good cause shown, no security is required to be provided by the Plaintiff for the issuance of this Preliminary Injunction.

*So Ordered this _____ day of _____, 2024.*

_____
_____, J.
Associate Justice, Superior Court

Proposed by:

**GRIMES & COMPANY, INC.**

By its attorney,

*/s/ Brian M. Casaceli*
Brian M. Casaceli, BBO #690580
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
Phone: 508.860.1478
Fax:    508.983.6295
Email: bcasaceli@mirickoconnell.com

Dated:  May 22, 2024

4



COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS

WORCESTER SUPERIOR COURT
CIVIL ACTION NO. 2485CV589 B

---

GRIMES & COMPANY, INC.
Plaintiff,

v.

BRIAN G. CARLSON.,
Defendant.

---

**PLAINTIFF'S MOTION FOR
SHORT ORDER OF NOTICE**



The Plaintiff, Grimes & Company, Inc. ("Grimes & Co.), respectfully requests that this Court issue a short order of notice scheduling a hearing on its Motion for Preliminary Injunction for **Wednesday, June 5, 2024, at 2:00 p.m.,** or as soon thereafter as it may be heard.

As grounds therefore, and as set forth more fully in its Verified Complaint and Demand for Preliminary and Permanent Equitable Relief, Motion for Preliminary Injunction and Memorandum of Law in Support of the Motion for Preliminary Injunction, Grimes & Co. states that the Defendant Brian G. Carlson has breached non-solicitation and non-disclosure restrictive covenants set forth in a Confidentiality and Restrictive Covenant Agreement he signed during his employment with Grimes & Co. Mr. Carlson is now employed by Advisors Capital Management, LLC, a competitor to Grimes & Co.

Grimes & Co. is at great risk of being irreparably harmed by such violations and misuse of its confidential information, and requires a short order of notice so that it may be promptly heard on its request for an order restraining Defendant from such continued activity.

5/22/24 SON to issue. Plaintiff shall promptly serve complaint. Returnable on 6/11/24 @ 2:00pm in Courtroom 18

**GRIMES & COMPANY, INC.**

By its attorney,

/s/ Brian M. Casaceli
Brian M. Casaceli, BBO #690589
Mirick, O'Connell, DeMallie & Lougee, LLP
1800 West Park Drive, Suite 400
Westborough, MA 01581-3926
Phone: 508.860.1478
Fax:    508.983.6295
Email: bcasaceli@mirickoconnell.com

Dated: May 22, 2024

4888-9838-2271, v. 1



## COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS

WORCESTER SUPERIOR COURT
CIVIL ACTION NO. 2485CV589 B

---

GRIMES & COMPANY, INC.
    Plaintiff,

v.

BRIAN G. CARLSON.,
    Defendant.

---

**PLAINTIFF'S MOTION FOR
SHORT ORDER OF NOTICE**

4

The Plaintiff, Grimes & Company, Inc. ("Grimes & Co.), respectfully requests that this Court issue a short order of notice scheduling a hearing on its Motion for Preliminary Injunction for **Wednesday, June 5, 2024, at 2:00 p.m.,** or as soon thereafter as it may be heard.

As grounds therefore, and as set forth more fully in its Verified Complaint and Demand for Preliminary and Permanent Equitable Relief, Motion for Preliminary Injunction and Memorandum of Law in Support of the Motion for Preliminary Injunction, Grimes & Co. states that the Defendant Brian G. Carlson has breached non-solicitation and non-disclosure restrictive covenants set forth in a Confidentiality and Restrictive Covenant Agreement he signed during his employment with Grimes & Co.  Mr. Carlson is now employed by Advisors Capital Management, LLC, a competitor to Grimes & Co.

Grimes & Co. is at great risk of being irreparably harmed by such violations and misuse of its confidential information, and requires a short order of notice so that it may be promptly heard on its request for an order restraining Defendant from such continued activity.

5/22/24 Son to issue. Plaintiff shall promptly serve complaint. Returnable on 6/11/24 @ 2:00pm in Courtroom 19

Arthur J.    Notices Mailed    5/28/24

4888-9838-2271, v. 1